OTTO BLAINE TRIGG, RESPONDENT, v. MARIE BURIN TRIGG, APPELLANT.—41 S. W. (2d) 583.

Kansas City Court of Appeals. April 6, 1931.

*Chas. P. Woodbury* and *McCune, Caldwell & Downing* for respondent.

*Oliver Debble* and *Atwood, Wickersham, Hill & Chilcott* for appellant.

BOYER, C.—Action for divorce. Plaintiff instituted this suit in the circuit court of Jackson county, Missouri, at Kansas City. The petition made the proper allegation of residence of plaintiff in said county and state for the period required to confer jurisdiction.

The grounds of divorce are "such indignities as to render his condition intolerable," and are set forth in this manner:

"That defendant habitually and without reason indulged in frequent and violent outbursts of temper when she would direct abusive, malicious and distorted remarks and statements to the plaintiff, in private and in the presence of friends and in public so that the plaintiff was greatly embarrassed and humiliated in the presence of friends and in public.

"That without reason but incited by jealousy and envy the defendant would direct abusive, malicious remarks, statements and accusations to friends and acquaintances about the plaintiff and about their friends and acquaintances to such an extent that their friends and acquaintances were alienated and estranged and plaintiff was thereby greatly humiliated and embarrassed.

"That by reason of the above facts plaintiff's happiness in home life was destroyed and he was prevented from associating with his friends and acquaintances in the way and manner and on the basis to which his position entitled him."

Service was had upon defendant by publication. She appeared first for the purpose of presenting a plea to the jurisdiction in which she alleged that "plaintiff has not actually resided in the State of Missouri for one whole year next preceding the filing of his petition." and that all the grounds alleged occurred. if at all, while plaintiff and defendant were husband and wife living in the State of California. Evidence was heard and the plea to the jurisdiction was overruled. Defendant was given time to plead further which she did by way of answer containing the same plea to the jurisdiction together with a general denial of all allegations except that of the marriage of the parties. Plaintiff was required to finance the defense of his case to the extent of furnishing suit money to defray the expense of obtaining depositions in California and the transportation of defendant from California to Kansas City and return.

At the time the case came on for hearing plaintiff was an army officer stationed at the Presidio at Monterey. California, and it appears that as a matter of convenience the court heard and received plaintiff's oral testimony when the first plea to the jurisdiction was presented and heard; that the further hearing of evidence was continued for a sufficient time to afford defendant opportunity to present her proof. After hearing all the evidence presented by the parties and requested by the court. a decree was entered in which it was found that plaintiff was the innocent and injured party and entitled to the relief prayed. The bonds of matrimony contracted between plaintiff and defendant were dissolved. An appeal was duly allowed and taken by defendant, and the court, upon her further application, allowed her attorney fees and maintenance pending

disposition of the case on appeal. For reversal of the decree appellant urges three reasons: (1) That the court had no jurisdiction; (2) that the petition fails to state a cause of action, and (3) there was a total failure of proof which would entitle plaintiff to a decree.

The jurisdictional issue in this case depends entirely upon the question of fact as to whether plaintiff in legal contemplation had "resided within the State one whole year next before filing of the petition." We will state the substance of the pertinent evidence. The parental home of plaintiff was in Kansas City. Here he was reared, educated, lived, and was employed after his college education until his employer sent him to San Francisco where he met and married defendant in 1914. He furnished an apartment and lived there with his wife until he entered the army as a commissioned officer in March, 1917. He voted in San Francisco in 1916, but at no other time or place exercised the right. Shortly after plaintiff secured his commission in the army he was ordered to Fort Leavenworth, Kansas. He stored his furniture in San Francisco and while he was in training at Fort Leavenworth for a period of three months his wife lived with his parents at 3316 Flora Avenue, Kansas City, Missouri, which place was claimed by plaintiff as his residence ever since. From Fort Leavenworth plaintiff was ordered to Fort Sam Houston and thence to France, where he remained for a period of twenty months. His wife accompanied him to Fort Sam Houston where she remained a brief period after his departure and then went to San Francisco for a few weeks, and thereafter lived in army quarters at the Presidio in San Francisco. During the war she received her mail and allowance at the Presidio by way of the Texas fort. Upon plaintiff's return he was ordered to Fort Ethan Allen, Vermont, where his wife joined him with their furniture from San Francisco. He remained there two years, and in 1921 he was ordered to Fort Riley, Kansas, where he and his wife lived at that army post unil 1926 when plaintiff was ordered to the Presidio in Monterey, California, at which latter place plaintiff and defendant lived in army quarters until their separation in August, 1929.

Plaintiff came to Kansas City about the first of October of the same year and instituted this suit. A part of his evidence was received in the following January, and he testified in effect that he and his wife established a home and residence in Kansas City, Missouri, thirteen years previously, it being the time when he was transferred to Fort Leavenworth, Kansas. That the home so established was with his parents at 3316 Flora Avenue; that he never maintained a residence elsewhere since that time and never intended to; that he and his wife lived at the address given in Kansas City during his stay at Fort Leavenworth, and that while he and his wife lived at various army posts since that time he never established a residence

elsewhere than in Kansas City; that during his absence in the World War his wife lived for awhile in Kansas City and thereafter at army posts. Plaintiff's application for War Risk insurance gave his home address as 3316 Flora Avenue, Kansas City, Missouri; named his wife as beneficiary, and gave her address the same as his own. He further testified that he had not ceased to maintain a home in Kansas City; that since his return from overseas he had been in Kansas City numerous times; that his room, furniture, and belongings were maintained at the residence number given, and that he has always looked to Kansas City as his permanent residence; that he has never claimed a home elsewhere since joining the army. Plaintiff was corroborated by his father as to the time and place of his residence in Kansas City and by two other resident witnesses of Kansas City that during and since the time of his service in the army he always claimed Kansas City as his home. Until October, 1929, he had not been in Kansas City for three years, but had been stationed on duty at the army post at Monterey.

Defendant's testimony is to the effect that she and her husband never had a home in Kansas City and never resided at that place, but she did admit that during the time of her husband's stay at Fort Leavenworth she "visited his people here in Kansas City, Missouri, those three months." "His people" referred to by defendant were the father and mother of plaintiff and their home was the address claimed as the residence of plaintiff. The testimony of defendant, together with that of her sister, tends to show various expressions indicating plaintiff's desire to live in California, and his intention to make that his permanent residence when he retired from the army; that he was very fond of California, desired to be transferred there, and partly thru the influence of his wife obtained a transfer to the army post in that State. There is no evidence that plaintiff and his wife at any time since his entrance into the army had or maintained a residence, or had a home, at any place other than the place named in Kansas City, except their living quarters provided for them at the various army posts at which plaintiff was stationed.

The evidence on the merits of the case is voluminous. The substance of all the proof upon the more important and decisive issues will be summarized. Plaintiff appeared in person before the court, as well as defendant and one of her sisters. The court also heard plaintiff's father and two other witnesses from Kansas City testify orally. The evidence of numerous witnesses was furnished by deposition.

Plaintiff testified to a series of indignities extending over a period of years in which he had repeatedly suffered public humiliation on account of unprovoked verbal assaults of abuse, profanity, and in-

criminating accusations by his wife and arising from her unrestrained temper, emotion, jealousy, and imagination. His evidence also shows that her unfounded accusations, comments, and statements were leveled not only at him, but at other people of their acquaintance and threatened to involve plaintiff in serious difficulty with his associate and superior officers; that his domestic life was rendered intolerable and his position and advancement in the army subjected to great hazard. Part of the story is stated by plaintiff in these words:

"The difficulty was that my wife was—her point of view was guided by her passions and an ungovernable temper, jealousy predominating; the last instance I think is typical; we were at a neighbor's on the post, at a little informal party, and during the party sometime, three or four of us were talking in the kitchen; there was a lady or two present and she became very wrathy at this for some reason, although nothing had been out of the way at all; there were several there; she cussed me in the presence of all, and her language was such that I immediately took her home, where the outburst was continued. As I say, there were no grounds for this at all. This jealousy and ungovernable rage continued practically during our married life; in fact it was practically ruined by these things. There were fifty similar instances to that, at least. . . . That of course upsets and disturbs not only your domestic life, but also your outside life because, as I say, these things would happen in the presence of friends and hurt you professionally also because our official and social life in the army is necessarily very close, inasmuch as we are living right together, and a wife's attitude of that kind, of course, mars your position quite a bit, and prevents you sometimes from being detailed on positions which would do you professionally a lot of good."

In reference to the alienation of his friends and fellow officers by the conduct of his wife, he said:

"I remember one case at Fort Riley where an officer came to me regarding statements that my wife made regarding their family which had been inspired by some sort of an outburst as I have mentioned and they were almost going to take it to the general post, but I persuaded him not to do that. . . . that happened several times."

There is much evidence relative to a New Year's party at plaintiff's quarters. According to plaintiff's version there were many guests, including officers and members of their families, and during the evening plaintiff left the party with two or three other officers at their insistence and request to go with them to report at another place where they had an engagement. He was absent approximately an hour and upon his return his wife met him and

his guests in a rage of anger and with loud, violent, and profane language disturbed the whole neighborhood, and accused him of visiting a house of ill-repute and "ladies of questionable character." "She called them whores." He attempted to quiet her on account of the guests and quoted her as saying "that she didn't give a damn about the guests, or a damn about anything else." According to plaintiff this performance was without justification and her accusations wholly unfounded. A guest of plaintiff who was sleeping in his house that night was aroused, and was disturbed and fearful as to what might happen from what he heard from defendant, which he described as very angry, loud, violent howling and screeching. He was fearful the violent language might lead to violent actions.

About the middle of June, 1929, plaintiff was detailed as adjutant of a training camp near Del Monte, about two miles from the post, where he remained until the latter part of August. It was during this time, and after a long period of meditation upon the subject, that plaintiff determined upon a separation with his wife. After going to camp he seldom saw or communicated with her. She remained in the army quarters. Plaintiff informed her of his decision. That a crisis had come in their married life is evidenced by correspondence between them. Defendant first wrote this letter:

"Dearie:

"For the first time in my life I see myself as I have been these many years, selfish, domineering. I realize what you have put up with and if I tell in all *sincerity* that I will spend the rest of my life trying to undo the things I have done & said to you. Won't you for the sake of some of the wonderful things that I know you can never forget give me a chance by my actions in the future to prove that I mean what I say this time. Think over this & try to let the sweet things overrule this bitterness that seems to be between us; so as when you do come home we can start on a basis that will make both you and me happier. Otto you've always been honorable, fair minded and big please give me the opportunity to show you I have changed.

"MARIE."

To the foregoing letter plaintiff replied:

"My Dear:

"I received your letter this morning and have of course given it quite a bit of thought during the day, not particularly the sentiments expressed, thinking because if you will stop to consider you have made practically the same avowels on numerous similar occasions in the past, verbally or by letter, all of which have led to nothing, worse than nothing as a matter of fact because such procrastination on our part has prolonged a mutual state of unhappiness which might easily have been avoided if we had accepted the situation as it so obviously was and taken the proper steps to correct it.

"It isn't necessary to go into all the reasons for this nor again hash over the details. We know them only too well. It is impossible for two people as radically different as we in temperament, disposition, viewpoint and what not to ever reach an understanding. It just isn't in the nature of things as many others beside ourselves have learned. And don't think from the above that I don't feel my own responsibility in the matter—I am no doubt too self contained to be adaptable to married life.

"So in order that each of us may get a little happiness out of the rest of our lives we will do now what we should have done years ago—try our luck apart. I intend to take a leave after camp and go home, hoping to get a change of station. Let me know your plans and what you will want me to say to friends in explanations—as you know I will abide by any thought you have in the matter. You may be sure also of course that I will do what you wish in the disposition of our personal effects.

"OTTO."

Following the receipt of her husband's letter, defendant made this answer:
"Dearie:

"After reading over your letter and talking to you on the telephone I want to make things as easy as possible for you—I realize I've caused this tragedy in our lives or my life at least & I will abide by anything you want done in the matter. As for final settlement of our personal affairs & effects that can not be done on paper so will remain here until you can come in & discuss it. I'm here alone as Win went home Thurs. so any time that's convenient for you will be for me. Otto I want you to know that I fully realize the years of unhappiness I've brought you—letting you go in peace is my atonement for it all. I shall try to find comfort in this thought for my own loss. Its the hardest thing I've ever done and perhaps the most generous.

"MARIE."

According to plaintiff, two of defendant's sisters called upon him while he was at the camp to inquire about the trouble, and he informed them that it was the same trouble of which they were aware that had hampered his married life; that they sympathized with him and stated that they knew; that they had often wondered how he put up with it as long as he had; that the whole family to some extent had to put up with the same things from her. One of the sisters who testified admitted that she said: "I realize maybe she was irritable." And further: "Well, Otto, you know we were brought up to regard marriage as a very sacred institution and very lasting, but if it is a divorce you want, we will help you. We will talk to Marie, we will make her see reason."

Defendant by her testimony and that of three sisters, a brother-in-law, and other friends sought to prove, and their evidence tends to show, that the married life of plaintiff and defendant was characterized continuously by mutual affection and domestic felicity until the summer of 1929, and that she was wholly without fault. When the break came defendant says that she was entirely unaware of any cause for the coolness and neglect of her husband which was then exhibited to her for the first time. She made repeated attempts by her own efforts and thru friends to have her husband return and explain to her the cause of his dissatisfaction. In response to defendant's requests he did call upon her at rare intervals and when it was reported that she was ill. The gossips became active and in a short time defendant was informed that her husband was paying undue attention to a certain "blond girl" who was visiting near the post. All that the evidence shows upon this subject is that plaintiff was seen dancing with the woman in question at a party in the hotel which was adjacent to the camp where plaintiff was on duty. Defendant herself and her sister exonerate the plaintiff from any conduct of an immoral nature with the woman in question, and defendant claims that the "blond" who is known as a Mrs. C., was one of her closest and best friends.

A large part of defendant's evidence is directed to an attempt to explain the letters written by her. She said that she was frantic in her efforts to effect a reconciliation and at a loss to know what to do; that Mrs. C, a Mrs. M, and defendant's sister, all finally advised her to write to her husband and to assume all the blame because that is what men like women to do, and that she might thereby draw him back to her. Defendant's sister wrote the draft of the first letter and defendant copied it. Mrs. M. claims credit for placing the incriminating words and the confession of fault in the mouth of defendant. She testified: "I told her that husbands like wives to be contrite. Say you are selfish, domineering, even if you do not feel that you are. I put the words in her mouth."

On cross-examination defendant was asked whether or not she was sincere and meant what she said when she wrote the letters and answered:

"Well, I don't understand your question; you must understand that I was grief stricken, my mind was all muddled, I would have written anything any one told me to do, or anything that came to my mind, taking the blame for everything in order to get my husband back."

"Q. Did you write these letters in good faith? A. Yes. Hoping they would effect a reconciliation, bring my husband back home so I could talk to him."

In the course of a long narrative she testified that when she read

her husband's letter "I just lost my mind. I couldn't believe such a thing. I guess we have had quarrels, tiffs, things like that, but they were always forgotten right away." She claims she did not understand the letter and called in a neighbor to read it and that "I was just crazy" and that she then said to her companion: "I must do something; I must write a letter. I want to make Otto see I am sorry. It must go and must go today because I must have him come in and tell me what's wrong with him." Between the two, the second letter was composed. Plaintiff did not appear and defendant says: "I was frantic and telephoned my sisters to come down," meaning her sisters at San Francisco. They come down, went to see plaintiff and reported that her husband had promised to come in and "explain things." Defendant relates that he did come in and that she said to him: "Otto, you don't mean this terrible thing, you don't mean you want to break up our home after all these years of married life." He said: "My decision is final." "Marie, you are wearing me down." She said: "Otto, if it is my temper fits or anything I have done to you, give me until December and I can change into anything you want." Plaintiff continued to repeat: "My decision is final."

Referring to the episode of the New Year's party, when defendant claims her husband departed from his home with some guests without notice to her, she testified that it was about midnight when he left and that he was gone about four hours; that she became greatly alarmed for his safety and was "frightened to death;" that she called up the hospitals, the police stations, and everybody on the post where she thought he might be; that it was about four o'clock in the morning when she heard a car coming; that she saw a major bringing her husband home; that she reproached her husband; admitted that she "raised" her voice and was a "little angry" and further testified: "I might have said 'damn,' something like that, sure; when I get mad or angry at something I might use the word 'damn,' but I don't think I ever used any obscene language or vulgar language. I have temper when provoked, I get angry at times, yes. I think at times I am quite irritable. I have had little occasions, I suppose, to show jealousy like any other wife who loves her husband." Defendant's evidence further shows that she had been in ill-health for the past five years and in a weak and nervous state; that she had undergone a surgical operation in 1921, and another in 1927; that she was under medical treatment in 1921 for nephritis and heart trouble. A statement from her physician was read in evidence as follows:

"Mrs. Marie Trigg has been treated by me from time to time since October 17, 1929. She shows bladder and kidney trouble which improves upon rest in bed and other appropriate treatment. She is by

disposition rather nervous and worried and often forces herself about when in reality she should be a bed patient. I regard Mrs. Trigg's condition as one of chronic nature and do not believe she will improve unless she has continued medical care.''

Defendant went to the Letterman General Hospital in San Francisco in the early part of 1929, and identified the following medical report under date of February 25, 1930:

''MEMORANDUM FOR: Captain O. B. Trigg.

''Mrs. Marie Trigg, your wife, came to the Outpatient service, Letterman General Hospital in February and May. 1929. At these times and in the days following them, she was given physical examinations, and various laboratory tests, such as gynecologic survey, electrocardiograph, basal metabolism, dental survey. As a result of these examinations nothing of importance was found to be organically wrong.

''J. M. Miller,

''Captain, Med. Corps.''

Defendant testified that she went to the hospital at the suggestion of a doctor at Monterey, mainly to take the heart test which showed negative because she didn't have a ''spell'' at the time. The testimony of various witnesses shows that up to the time of the separation defendant participated in a great many social activities, and on numerous occasions entertained extensively at her own home; that she always did her own work and prepared the meals for their guests herself; on one, occasion to the number of forty, and upon another, it being the first of January 1929, she prepared the supper herself for twenty guests. Defendant also claims that at this period she was undergoing the ''change'' due to age. The evidence is clear however, that her manifestations of hysteria, which put her to bed, were not apparent until she had learned that the separation with her husband was imminent. The evidence shows that defendant's sisters and members of their families had on numerous occasions made protracted visits in the home of plaintiff, and in the summer of 1929, one of her sisters had placed two of her small children in the charge of defendant for care. Defendant's sisters who called on plaintiff at the training camp denied his version of the interview in respect to any admissions made by them. One of the sisters who accompanied her to Kansas City and testified was present at the home of the parties when attempts were being made at reconciliation, and when plaintiff had come in to see his wife. She relates that she and her young sister, who was also present, went into an adjoining room to pray so they would not hear what was said between plaintiff and defendant. Witness proposed that they go in and ''pray hard,'' but says they could not pray because they were so distracted on account of what they heard. Witness took excep-

tion to a remark of plaintiff and burst into the room where the parties were and called plaintiff "a despicable cad, and a man without honor." Later in her testimony when asked about the interview between herself and plaintiff at the training camp and whether plaintiff's statement was true as to what occurred, she said: "That is an infamous lie." We have already extended this statement beyond reasonable limits and deem it unnecessary to give further details of the evidence.

## OPINION

On the question of jurisdiction, appellant strenuously urges "that the very strict requirement of our statute in regard to residence was overlooked by the trial court." The statute referred to, section 1804, Revised Statutes 1919, now section 1353, Revised Statutes 1929, provides:

"No person shall be entitled to a divorce from the bonds of matrimony who has not resided within the State one whole year next before the filing of the petition unless the offense or injury complained of was committed within this State or while one or both of the parties resided within this State."

The injury complained of was not committed within this State, and plaintiff was required to allege and prove that he had resided within the State the required time. It is immaterial where the wrongs were committed if plaintiff was in a legal sense a resident of Missouri for the period named. [Hays v. Hays (Mo. Sup.), 24 S. W. (2d) 997.] Appellant contends that plaintiff was a resident of California; that he had never changed his residence from that State; and if he did re-establish a residence in Missouri, it was not of the character required by the statute to enable him to prosecute a suit for divorce; and that the "residence" referred to in the statute means "the actual bodily and physical presence of the plaintiff within the State for one whole year before the suit is instituted." It must be conceded that plaintiff was a resident of California when he entered the army in 1917, and that his legal residence would be presumed to remain the same until changed. However, it is equally true that there is no inability on the part of a soldier to effectually change his residence as a citizen if he so desires. The law upon the subject is well stated in 19 C. J. 418, as follows:

"The domicile of a soldier or sailor in the military or naval service of his country generally remains unchanged, domicile being neither gained nor lost by being temporarily stationed in the line of duty at a particular place, even for a period of years. A new domicile may, however, be acquired if both the fact and the intent concur."

From the evidence detailed it is apparent that there is substantial proof that plaintiff abandoned his residence of choice in California when he entered the army and was ordered to Fort Leavenworth; and that he then reverted to his former Missouri domicile and re-established a residence at his old home in Kansas City, to which place he sent his wife, and where she lived for at least three months. There was a concurrence of intent and acts upon his part at that time sufficient to meet the requirements of the law to establish a residence within the State. In addition to bringing his wife to Kansas City and establishing her in that home, he gave the home address of both himself and his wife as 3316 Flora Avenue, Kansas City, Missouri, in his application for War Risk insurance. There is no evidence of an intent or act on the part of plaintiff to change his residence after it was re-established in Kansas City, and before the institution of this action. The contention that plaintiff was a resident of California when he filed suit cannot be sustained. Plaintiff abandoned said residence and acquired another by the concurrence of intent and acts sufficient to re-establish a residence in Kansas City. But appellant further contends that the residence, if any, which was re-established in the State was not of the character required by law to authorize the institution of an action for divorce because of the absence of plaintiff from the State, and that under the statute in question plaintiff must not only be a resident as commonly understood, but that the statute requires "the actual bodily and physical presence of the plaintiff within the State for one whole year before the suit is instituted." We cannot agree that such is the law, but interpret the section of the statute in question to mean that if a person has become a resident of the State and remains so without change for the required period he does not lose his right of action for divorce merely because he was not physically present continuously within the State one whole year before filing a petition. Manifestly the Legislature never intended otherwise. Residence is neither gained nor lost by merely crossing the State line. Authorities relied upon do not sustain appellant who emphasizes and depends chiefly upon certain expressions used in an opinion delivered by this court in the case of State ex rel. v. Davis, 199 Mo. App. 439. In that case husband and wife were both residents of the State, and the main question was the right of the wife to establish a residence in some other county in the State separate from that of her husband and to establish venue of her action in the county where she resided. In the course of the opinion Judge TRIMBLE used the following words:

"To create a domicile or residence as here used, only two elements are fundamentally and absolutely necessary or essential. These are actual *bodily presence* in the county or place combined with the freely exercised *intention of remaining there* permanently, or for

an indefinite time at least. Whenever these two elements combine a domicile of choice is created and all former domiciles are *ipso facto* abandoned. . . . Neither presence alone nor intention alone will suffice to create a domicile of choice. Both must concur and at the very moment they do concur, the domicile is created. The term residence as here used means simply the actual *bodily presence* of the party, if that presence is coupled with the intention to remain permanently.''

It is obvious that this language was meant to apply to the facts and circumstances in the case then under consideration, and it is equally obvious that it is directed solely to the elements necessary to *create* a residence. It has no reference whatever to the elements necessary to *maintain* said residence. The case is not an authority for the proposition that there must be a continuous physical presence for one whole year before suit. To give such interpretation to the statute would be unreasonable and oppressive. We hold in accord with the general expression of the law that residence is largely a matter of intention evidenced by some act or acts in conformity with such intention, and that a residence once established within this State and not thereafter changed is sufficient for the maintenance of a divorce action, notwithstanding the physical absence of the resident for a short or long period. In the case of an army officer it would be peculiarly arbitrary and unjust to deny him the right accorded any other citizen merely because of his physical absence from the State in the performance of his duty as a soldier. His absence is not of his own volition, but is occasioned by necessary obedience to martial orders. The continuity of residence is not broken by a mere bodily absence from the State. Appellant says that no case has been found where the facts are exactly like the ones involved here. Residence involves a question of fact controlled mainly by intention. The trial court determined this question upon substantial proof and we see no reason to interfere with the finding made. The following authorities support the conclusions which he have reached and stated above. [State ex rel. v. Shepherd, 218 Mo. 656, 666, 117 S. W. 1169; Humphrey v. Humphrey, 115 Mo. App. 361, 363, 91 S. W. 405, and cases cited; In re Kalpachnikoff, 28 Fed. (2d) 288; Ex parte White, 228 Fed. 88; 9 R. C. L. 551; Harris v. Harris, 204 Ia. 555, 215 N. W. 661; Stevens v. Allen (La.), 71 So. 936; Johnston v. Benton, 73 Cal. App. 565, 239 Pac. 60; Pendleton v. Pendleton, 109 Kan. 600, 201 Pac. 62; Walton v. Walton, 6 S. W. (2d) 1025; Nolker v. Nolker, 257 S. W. 798.] The plea to the jurisdiction was properly denied.

The attack upon the sufficiency of the petition is not pursued. All that appellant says is that the allegations are vague and set forth conclusions of law without any charges of specific acts of in-

dignities. One case is cited, Marolf v. Marolf, 191 Mo. App. 239, in which it is said:

"If the indignities had themselves been set out so that the court could see whether they were indignities or not, and they had been alleged to be such as rendered her condition intolerable, said last ground would have been well pleaded."

No further effort is made to show the petition defective. The allegations are sufficiently specific for the court to determine that the charges made are in fact indignities within the meaning of the law.

On the merits of the case we are confronted by the declaration of appellant "that there is absolutely no substantial evidence of indignities which would entitle plaintiff to a decree." In an extended brief and argument learned counsel seek to demonstrate that the evidence is vague and that all it shows "is most trivial and inconsequential." On account of their strenuous and earnest efforts we have examined with care the long record of the evidence and have stated enough to justify the decree entered in the case. It is unnecessary to restate any part of the proof. It is sufficient to say that our conclusion is that the weight of the evidence shows that plaintiff was habitually harassed and humiliated in private and in public on account of the unprovoked, unreasonable, and wholly inexcusable conduct of defendant which arose either from an ungovernable temper or unfounded jealousy. This was no trivial offense, but a gross and flagrant wrong. Plaintiff submitted, and endured such conduct for a period of years, and it is easy to conceive that the indignities offered eventually became intolerable. There was ample corroboration. Neither spouse is required to submit to constant abuse, continual bickering, habitual accusations, or gross insults when unmerited and undeserved. We say this with regret because a woman's rights are involved. The spirit of true chivalry is not gone. It is a living and active reality in the soul of every worthy man. But justice is the chief end of the law, and in its equal application sex is unseen and unknown. The rights of one spouse are entitled to the same consideration as the rights of the other. The case was heard by an able and conscientious judge who had the advantage of observing the demeanor of witnesses and we are satisfied with his conclusions. The decree should be affirmed. The Commissioner so recommends. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of BOYER, C., is adopted as the opinion of the court. The decree is affirmed. All concur, except *Trimble, P. J.,* absent.