EDWARD CLEMENS, Appellant, v. LUCILLE DAVIS CLEMENS, Respondent, No. 41928—235 S. W. (2d) 342.

Division Two, December 11, 1950.

Rehearing Denied, Janurary 8, 1951.

*Charles M. Spence* and *Harold I. Elbert* for appellant; *Frank W. Jenny* and *Thompson, Mitchell, Thompson & Douglas* of counsel.

*Ralph C. Lashly* and *Leo A. Politte* for respondent.

488

[342] BARRETT, C.— In this divorce suit the trial court has dismissed the husband's petition and granted the wife a divorce upon her cross bill and awarded her $30,000.00 alimony in gross, and additional attorneys' fees. In their petition and cross bill both parties, as grounds for divorce, rely solely upon "such indignities to the other as shall render his or her condition intolerable." Mo. R. S. A., Sec. 1514. The wife contends that she proved the requisite insufferable, intolerable indignities and thereby clearly and plainly established her right to a divorce. She urges, since the trial court has found for her, that it is this court's duty to defer to the trial court's finding, especially so in view of the conflicting evidence as to certain of the indignities upon which she relies, and sustain her decree. Hoecker v. Hoecker, (Mo.) 222 S. W. 387, 389. The husband urges that the evidence does not sustain the wife's right to a decree of divorce upon the ground of indignities but on the contrary demonstrates that it is he who has suffered the intolerable indignities and is the innocent and injured party entitled to a divorce. This court recognizes and adheres to the rule of deference, particularly so to the trial court in this case. But upon this, the husband's appeal, it is likewise this court's duty and responsibility, as it was with the trial court initially, to try the cause anew and enter such judgment as this court is compelled by the probative force of all the circumstances. Schulte v. Schulte, (Mo.) 140 S. W. (2) 51, 54; Vincent v. Vincent, (Mo.) 123 S. W. (2) 86; Bassett v. Bassett, (Mo.) 280 S. W. 430.

On the date of the trial, in January 1950, Mr. Edward Clemens, the husband, was sixty-five years of age. He started out in 1901 as a messenger boy for the Terminal Railroad and remained with that company in various capacities until 1932 when he was assigned the duty of managing its St. Louis Mart. In 1936 he became executive vice-president of the Mississippi Valley Barge Lines Company and retired as its president on December 1, 1948. He was first married in 1912 and his wife died in 1942. In 1942, as a "dollar a year man," he was chosen director of waterway transportation for the Office of Defense Transportation and partially moved his residence to Washington, D. C. It was there that he met and married Lucille Davis, who was employed and made her own living. She was thirty-seven years [343] of age at the time of the trial and had been twice married and twice divorced before her marriage to Mr. Clemens on February 9, 1945.

At the time of the trial Mr. Clemens had a net worth of about $100,000.00, all of which he had accumulated prior to his marriage to Lucille Davis. She claims that he is worth $140,000.00. In addition they own, as tenants by the entirety, a farm near St. Clair of the value of $25,000.00. Since his retirement he has an annual income, from retirement pay, annuities and stocks of $9600.00.

Immediately after their marriage they returned to St. Louis and lived in an apartment at 3308 Russell Boulevard. They spent week-ends on the farm near St Clair and on January 1, 1949 they gave up their residence in St. Louis and moved to the farm. They had quite a lot of company, for the most part his old friends and business associates. They were convivial and gave and attended a great many dances, dinners and cocktail parties and it was out of these social engagements, principally, that the incidents upon which she relies as indignities occurred. She said that he was "not too easy" a person to live with, that he always found fault with her, said that she wore too much lipstick and ridiculed her hats and clothes and was not always even tempered. She testified that he used vile and offensive language towards her but she could not recall any specific occasions at the moment. She said that he failed to provide her with the necessities and failed to properly support her. He gave her an allowance of $150.00 a month, however, and any sum she saved he matched with a like sum in a savings account which at the time of their separation amounted to about $2400.00. She bought her clothes from her allowance and was able to recall that the only other bills she ever paid were $20.00 for some aluminum, $125.00 for some Venetian blinds and $3.98 a pair for some curtains. Admittedly Mr. Clemens paid all the grocery bills, all other major items concerning the furnishing and upkeep of the house and, in fact, all other bills and expenses. But, as we have indicated, the acts and conduct upon which she principally

relies as constituting intolerable indignities occurred after or grew out of cocktail parties and social engagements.

On October 15, 1948 they attended the Traffic Club party at the Chase Hotel and she says that he was quite drunk and kept dancing with another woman and left her stranded without a partner for the last dance. She said: "And I asked him about it later and he didn't like it at all. And then when we got to the apartment he knocked me down." This is her description of another incident: "December 28th, at a cocktail party at some friends' of mine in Clayton he became quite drunk, and drank Martinis from a drinking glass, and they were serving cherries instead of olives. And we came home, and someone had invited us to a party for a nightcap. So he didn't want to go, he wanted to go home. So when we went in the garage he came around to the door of the car and drug me out on the concrete walk, and ripped my clothes." She testified that at these social events he frequently had lipstick on his face and handkerchief and that after their separation she found one of his undershirts with lipstick, rouge and other incriminating matter on it. She complained of his being drunk on Easter Sunday when they had some of his friends for dinner. Of this day he said: "Easter Sunday, the day I had too much to drink, and which is admitted." As to the lipstick and his kissing the ladies he said: "She has quarreled with me often and vociferously because she would see the lipstick imprint on my handkerchief after lovely friends of ours have come out and kissed me, 'Hello, Uncle Ed,' my sister or anybody else. It would embarrass me, there is no answer to it, just say that I had been associating with other women." He denied that he knocked her down after the Chase Hotel party or that he ever struck her.

This is his version of the December 28th party and its aftermath: "They had an inexperienced person mixing drinks, and the laughter of everybody was about cherries in the Martinis and olives perhaps in the Manhattans—she got her ingredients a little bit mixed. And we laughed about that to some extent. Anyway it was quite a pleasant gathering and lasted I would say until well [344] after midnight—not too long. They had hors d'oeuvres to eat, and we left there, I thought, in fine humor. We had no more than entered the car, until Mrs. Clemens began the usual admonition to me that I had been too attentive to somebody, and it happened in this case to be Mrs. ————, and that I had neglected ————. And as we drove along it got later, of course, and Mrs. Clemens says, 'We are going out to ————,' I don't know the lady very well, and I don't remember her name '* * * on Hanley Road.' I says, 'That is pretty far out, I think you have had enough to drink, let's go home.' She says, 'We are not going to do that, I am going out there if I have to go by myself.' I says,

'Please don't act like that, we have a breakfast engagement,' and continued to drive on down to our apartment. And when we arrived there Mrs. Clemens began to be quite abusive and said that I was an old fogey. I says, 'Now, remember, it is approaching two o'clock,' and I sat there for half an hour pleading with her to go to bed, so we could get up next morning to keep our breakfast engagement. She said she wasn't going up to bed, that she had a key to the car, and I reminded her that she had never gotten a license to drive the car, and besides, 'I don't think you ought to drive at this time of night.' Well, she says, 'Louise invited us.' I said, 'That is true enough.' And I continued to plead with her to go upstairs, and I went around to open the door, and to continue my pleading, and she just sort-of half rolled out of the car. And I intended to grab her by the lapel of her coat, and instead caught her by the dress, and as she fell the bosom was torn in her dress. She sat down, not heavily, I would say, but she did sit down. And I helped her up and picked up her little bag that had cosmetics in it, and she went upstairs.''

When he struck her, after the Halloween dance, she said ''I thought I was pregnant'' and, in her judgment, as a result of the blow, she suffered a miscarriage. In connection with this testimony he offered in evidence hospital records which showed that she had entered the hospital on November 26, 1948 at 4:30 p. m. and was discharged at 11:00 a. m. on November 28, 1948. An obstetrician and gynecologist examined the record and testified that it showed ''dilation and curettage,'' an operation for therapy but principally for diagnosis—''a procedure in which the entrance of the uterus is dilated so an instrument can be passed in the cavity of the uterus, and the lining wall of the uterus is scraped away, partially or completely.'' She, as we understand the record, had said that she left the hospital on November 28th and that she did not thereafter menstruate until January 3, 1949. The doctor gave it as his opinion that ''the absence of menstrual flow from the date of the dilation and curettage to January 3rd would not necessarily imply the presence of a pregnancy during the intervening period.''

He likewise complained of conduct and incidents on her part that arose out of their social life and mutual drinking. He said that her favorite epithet, applied on occasion after occasion, was ''dumb son-of-a-bitch'' or ''you old dumb son-of-a-bitch.'' He said that she drank to excess and constantly quarreled with him over trivial matters. When he declined the challenge of a quarrel and sat reading his paper she kicked it out of his hands. Once she slapped his glasses off and another time danced on his hat. She specifically denied these outbursts and incidents. But he also relied upon circumstances, some of which she does not deny and in which he had some corroboration, that did not arise out of their mutual

drinking and social activities. He said: "Well, we had a number of rather serious skirmishes, but the major difficulty began after the acquisition of the farm (November 1946) which was enthusiastically agreed to by my present wife."

He said that they established his ill brother and his wife on the farm as caretakers and they would visit the farm on week-ends. That arrangement was satisfactory for a few weeks and then "Mrs. Clemens became obsessed with the idea my brother was trying to get the farm away from me. I tried to dissuade her, and she was so insistent upon that viewpoint that she was violent * * *." He said that she abusively discussed the subject with the [345] brother and even accused him of feigning his illness. He said: "Well, she called me a dumb son-of-a-bitch because I couldn't realize that my brother was trying to get the farm away from us." He testified that she continued that attack until the brother left the farm in November 1947.

He testified to another episode concerning the brother. They were in Wisconsin on a vacation trip when the brother died in August 1948. He received a message of his death and "Without being precipitate, we began to drive back to St. Louis about—and arrived at St. Louis about 10:00 or 10:30 p. m. on a Friday evening. Whereupon, I called my brother's widow to inquire about the funeral arrangements, and she told me that since I was the senior member of our whole family, they were deferring to me, and they could not make arrangements for the funeral on Saturday, but would have it on Monday. And I told her I would come out to see her the following day. And when I conveyed that message to Mrs. Clemens she said, 'Why in the hell did we hurry home if he funeral is to be on Monday. Why couldn't we have stayed up there and enjoyed ourselves a couple of days more.' * * * I said, 'Well, we came home because my brother is dead.' " They then engaged in a discussion, so he said, of her regard for his brother.

Then there was an episode when they were on a trip to Florida in March 1949. They visited her mother in West Palm Beach and attended her sister's wedding. A day or two after the wedding the groom was to be out for the evening and Mr. Clemens suggested that they take the sister out for dinner. He described the ensuing episode in this manner: "We went to a cocktail room and had a couple of drinks, and I suggested to Mrs Clemens' sister that she might select a place to have dinner because I didn't know of any such place. And she selected a place within walking distance, and also close to the apartment where she lives. We went in and sat down at the table, and the prices were somewhat—considerably higher than you find ordinarily—and Mrs. Clemens remonstrated very—she remonstrated with her sister about taking us into such a place and said, 'You wouldn't have come in here by

yourself if you were paying the bill.' * * * to my chagrin and embarrassment, as well as her sister, after I had invited her sister to select the place. And I tried to compose the situation, but Mrs. Clemens insisted that we leave, and we did leave without getting any service,'' and they returned to their respective apartments without dinner. The next morning they had an acrimonious argument about the episode and whether she would apologize to her sister. He said that the discussion ended when she plopped half an orange in his face and went alone to the beach for the day.

There was an episode at the farm when, he says, Mrs. Clemens became enraged after he had loaned their tenants a vacuum cleaner. She had an angry argument with the tenant's wife and fired the tenant. Mr. Clemens re-hired the tenant at an increased salary and thus partially mollified the tenant.

She accused Mr. Clemens of associating with another woman and demanded that he fire his old company's secretary. She said that a detective told her that he had seen two women, Mr. Clemens and a single man friend of his in the man friend's apartment. The detective denied he had ever told her that he had seen Mr. Clemens with a woman. There is no persuasive evidence that Mr. Clemens ever associated with another woman but as a result of her thinking so she did employ two detectives to follow him and in doing so his single friend became aware of the fact that they were watching his apartment and making inquiries of the apartment's staff. When the angry friend called her about it she denied that she had employed the detectives.

The two or three days culminating in their separation revolved around a violent argument on her part, so he says, concerning the planting of some flowers or shrubs and a walk in the farm yard. The argument, as he related it, need not be detailed but it was long and bitter and he concluded his description of it in this language: ''And she said, 'You Mister Milquetoast son-of-a-bitch, you haven't got enough spirit to [346] fight.' This Mr. Milquetoast, I might say, is the meek man in the funny paper.'' But whether the argument ended as he said or not, on the following day they were to go to St. Louis as the guests of some of his friends and attend the christening of the towboat, Sohio. They went to his friends' house and, he says, when the hostess went upstairs 'Mrs. Clemens started towards me, sort of gnashing her teeth and got hold of my arm and made an effort to bite my arm. And I called Mrs. ————————— to see if she couldn't do something to quiet Mrs. Clemens down. Whereupon Mrs. Clemens calmed down immediately, when somebody else stepped into the picture, to some extent, and she began to again berate me * * * and said that I had told her that in view of the quarreling and upset conditions that I didn't feel like going to the christening. And she said, I was going,

and insisted upon it, and Mrs. —————— came down, and Mrs. Clemens said, 'If you don't go, I will take Mrs. ——————.' I said, 'Well, remember Honey, it is an invitation affair and you might embarrass Mrs. —————— by taking her without an invitation.' Well, she said, 'What are you going to do?' Well, Mrs. —————— then very graciously insisted that I come back there to stay that night as I had originally intended, and I told her no, I wouldn't do that. I didn't want to impose any unpleasantness upon them. So Mrs. Clemens got between me and the door, and after a considerable time, just defied me to go out. And so finally she went out of the door and got in the automobile which was outside with the key in it, and got behind the wheel, and would not permit me to get my bag out of the car to go and stay some place else that night." He did go to the Missouri Athletic Club that night and that was the beginning of their separation. There were other episodes, claims and denials on both sides before and after the separation, but those related are sufficient for the purposes of this opinion.

In conclusion, upon the record and trial anew, it may be noted that the term "indignity" as employed in the statute is not capable of precise definition (Bassett v. Bassett, supra), as plainly appears when applied to particular cases. In this case, with these people, all the detailed circumstances must be considered in the appropriate setting of their background. Their pursuits and mode of life considered, some of the episodes, particularly those relied upon by the wife, consisted of isolated offenses, if not mere wranglings (Trigg v. Trigg, (Mo. App.) 41 S. W. (2) 583) resulting from their mutual drinking and attempted convivial social life, and, in their context, trivialities by comparison. Chapman v. Chapman, (Mo. App.) 230 S. W. (2) 149. (Compare, from perhaps a somewhat different social background, O'Donnell v. O'Donnell, (Mo. App.) 216 S. W. (2) 764.) It is indeed plain that the merits of her cause are not comparable to Pickett v. Pickett, (Mo. App.) 150 S. W. (2) 587 or to Viertel v. Viertel, 212 Mo. 562, 111 S. W. 579. Assuming that all the principal incidents upon which she relies occurred, they do not clearly demonstrate or plainly persuade with convincing probative force that they constitute the contemplated insufferable, intolerable indignities. In their context it is difficult to find and believe that they resulted in permanent offense to her innocence or serious and lasting injury to her natural dignity. In short, the probative force of her testimonial is lacking in that naturally compelling ring of sincerity manifesting innocent injury, and, as we are so persuaded and view the record, she was not entitled to a decree of divorce. Rusche v. Rusche, (Mo. App.) 200 S. W. (2) 577; Hoffman v. Hoffman, (Mo. App.) 224 S. W. (2) 554.

On the other hand, even though the husband is not without fault (Viertel v. Viertel, supra), the incidents and episodes related by him, some of which are corroborated by circumstances and other witnesses, connote rather long continued disdain and contumely from which personal estrangement, lack of genuine affection and disregard of marital rights and feelings is a fair inference. There were not only repeated episodes of uncontrolled temper but of studied and intentional incivility manifesting a disregard for personal dignity, if not of hate,—intolerable indignities convincingly sustained by substantial evidence [347] (Carr v. Carr, (Mo.) 232 S. W. (2) 488), as we find and view the record, entitling the husband to a divorce. Bassett v. Bassett, supra; Tebbe v. Tebbe, (Mo. App.) 21 S. W. (2) 915.

Accordingly, the judgment dismissing the husband's petition and decreeing the wife a divorce and granting her alimony upon her cross bill is reversed and the cause is remanded to the circuit court with directions to enter a decree of divorce to the husband. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.