Arthur Lee OLIVER (Plaintiff), Respondent,

v.

Wanda Bishop OLIVER (Defendant), Appellant.

No. 30283.

St. Louis Court of Appeals.
Missouri.

June 16, 1959.

William R. Hirsch, St. Louis, for appellant.

Charles A. Grassmuck, Jr., St. Louis, for respondent.

DOERNER, Commissioner.

This is an action for divorce which was instituted in the Circuit Court of the City of St. Louis, by Arthur Lee Oliver, 27 years of age, a Staff Sergeant in the United States Marine Corps, against his wife, Wanda Bishop Oliver, 22 years of age. The appeal is by the defendant.

Plaintiff's petition was filed on September 12, 1958, and on the same day a summons was ordered to be issued to defendant in Lawrence County, Ohio. On September 30, 1958, counsel for defendant entered his appearance and filed a joint motion in which it was alleged that defendant was entering her appearance for the special purpose of denying the jurisdiction of the court, because the plaintiff was not, and for more than a year had not been, a resident of Missouri. Subsequently, on October 7, 1958, without the motion having been passed on, defendant filed an answer to the petition raising the jurisdictional question, admitting the marriage and the birth of the parties' child, denying all allegations, and asking for the custody of the child. The cause was heard on the same day, and taken under advisement. Three days later, on October 10, 1958, defendant filed an answer and cross-bill, in which she prayed that a decree of divorce and custody of the child be awarded her. No question of jurisdiction was raised therein, save whatever might be the effect of defendant's general denial of plaintiff's allegations, including that of residence in Missouri.

Defendant's cross-bill was submitted on the evidence previously adduced. On October 29, 1958, an order was entered of record submitting defendant's cross-bill on the evidence previously adduced.

The court, on November 12, 1958, dismissed defendant's cross-bill, granted plaintiff a divorce, awarded him custody of the parties' four-month old son but ordered that the plaintiff's mother, Mrs. Martha Shea, have the care, supervision and control of the minor child as long as plaintiff remains in military service or until the further order of the court, and gave the defendant visitation privileges at certain specified times. Within the required time, defendant thereafter filed a motion in which she asked, alternatively, for a new trial, for judgment in her favor, or for an opportunity to adduce additional testimony. Following the overruling of those motions, defendant appealed to this court. Plaintiff has not favored us with a brief, for reasons best known to him.

The parties were married on April 1, 1956, while the plaintiff was stationed at the Mare Island Naval Yard, in California, and the defendant, then a member of the United States Air Force, was stationed at Hamilton Air Force Base, 20 miles away. On November 30, 1956, plaintiff was transferred to attend the Recruiter School at Paris Island, South Carolina, and in order to accompany him defendant obtained a discharge from the Air Force on the same day. Following his tour at the Recruiter School, plaintiff was assigned to the Fifth Naval District, based at Charleston, West Virginia, to which he reported on February 22, 1957. While at Charleston, the parties bought a trailer, in which they resided. In August of 1957 he was placed on recruiting duty at Huntington, West Virginia. The house trailer was kept parked in a trailer camp in Chesapeake, Ohio, across the river from Huntington. A son, Michael, was born to them on May 17, 1958. They separated on September 7, 1958, under circumstances which will be subsequently detailed.

■ The initial assignment to be considered, though not the first one raised in defendant's brief, is that the trial court erred in assuming jurisdiction of the cause for the reason that the plaintiff's petition did not aver the jurisdictional domicile of one year, and because plaintiff's evidence failed to show that he had resided in Missouri for at least the required one year immediately prior to the institution of his suit. If it were true that plaintiff's petition failed to contain an averment of one of the statutory jurisdictional requirements, the point would be well taken, Price v. Price, Mo.App., 281 S.W.2d 307; State ex rel. Stoffey v. La Driere, Mo.App., 273 S.W.2d 776. But defendant apparently overlooks that part of plaintiff's petition in which, after referring to his military service, he alleges that "* * * he has been domiciled in St. Louis, State of Missouri, continuously, and has never acquired a new or different domicile, and is a citizen and legal resident of Missouri and has been for more than one whole year prior to the filing of this petition." This was a sufficient allegation as to residence. Section 452.050 RSMo 1949, V.A.M.S.; State ex rel. Stoffey v. La Driere, supra.

■ Regarding proof of residence, the substance of plaintiff's evidence was that he was born in St. Louis and always lived in that city until he entered the military service in 1950; that St. Louis is recorded as his home on his service record; that he lived elsewhere only pursuant to military orders; that he had never registered in any other place; that he intended and considered St. Louis to be his home; and that he intended to return to St. Louis upon the completion of his military service. No contradictory evidence was introduced by the defendant. In Barth v. Barth, Mo.App., 189 S.W.2d 451, 454, cited by defendant, it was stated: "* * * The residence of a soldier in the military service of his country generally remains unchanged though he may be temporarily stationed in the line of duty at a particular place, even for a period of years. This is so because he acts under

military orders, and not of his own volition. He may, however, acquire a new residence if both the fact and the intention concur." To the same effect see Trigg v. Trigg, 226 Mo.App. 284, 41 S.W.2d 583. In the light of the foregoing evidence, the trial court was fully justified in finding that it had jurisdiction of the case.

■■ The next assignment for our consideration is that the trial court erred in admitting in evidence, over defendant's objection, testimony by the plaintiff as to certain statements made by the defendant, for the reason that they were privileged communications between husband and wife. At the commencement of plaintiff's testimony dealing with what he claimed were indignities committed by defendant, the objection was raised to any testimony as to what defendant might have said to plaintiff unless it were shown that there was another person or persons present, on the grounds of privileged marital communications. The objection was overruled, and thereafter plaintiff was permitted to testify as to various statements made to him by defendant, including the threat to take their child and leave, and that plaintiff would never see the child again, after plaintiff made a request for schooling at the Army Survival School, at Fort Bragg. It has long been the general rule in this state that conversations between husband and wife, which do not take place in the presence of a third party, are privileged communications and are not admissible in divorce actions. Berlin v. Berlin, 52 Mo. 151; Reynolds v. Reynolds, 297 Mo. 447, 249 S.W. 407; Revercomb v. Revercomb, Mo.App., 222 S.W. 899; Coleman v. Coleman, Mo.App., 318 S.W.2d 378. Even threats of one spouse to kill the other, unaccompanied with any act constituting an assault, or the display of a weapon, have been held inadmissible. Revercomb v. Revercomb, supra; O'Neil v. O'Neil, Mo.App., 264 S.W. 61. It is true that in a criminal case the Supreme Court recently held that a wife, testifying voluntarily, is a competent witness against her

husband in a prosecution for acts constituting a crime of personal violence against her child, State v. Kollenborn, Mo., 304 S.W.2d 855, but the court was careful to limit the application of its decision to criminal cases. It is likewise true that over the years, in divorce cases, various exceptions have been made to the general rule. Reynolds v. Reynolds, supra; Maget v. Maget, 85 Mo.App. 6; Phelps v. Phelps, 241 Mo.App. 1202, 246 S.W.2d 838. However, the testimony introduced in the instant case does not come within the exceptions to the general rule as made by those cases, and the court therefore erred in admitting it.

The question next presented is whether the plaintiff's remaining evidence was sufficient to sustain the decree of divorce granted him. The grounds charged were indignities. Plaintiff admitted that while there were one or two prior instances of strained relations, their marriage was a relatively happy one until shortly before the defendant became pregnant. His complaints were that the defendant would not accompany him to the grocery store on Saturdays and that he had to do the family marketing; that she vacillated on the question of having a child, first wanting one and then changing her mind; that at times he was forced to clean the house when he came home from work, because it was dirty; that defendant frequently neglected to fix his meals; that after the baby was born he would come home and find diapers to be washed and dirty dishes in the sink, and his wife watching television; that he would have to do the diapers and hang them out to the amusement of the neighbors; that defendant was not particularly ill either before or after the child was born; that at times when he came home during June, 1958, after working ten or twelve hours, he would find the child in dirty diapers; that defendant couldn't handle money; that defendant had a temper; and that on one occasion he had to prevent her from committing suicide by drowning.

The effect of plaintiff's evidence was greatly minimized on cross-examination. Plaintiff admitted that defendant was employed or was well into her pregnancy during the time he claimed she failed to accompany him to do the marketing; admitted that after repeated unsuccessful efforts to conceive, over a period of time, defendant obtained medical service in Charleston to aid her in her efforts to become pregnant; and admitted that defendant's alleged deficiency in housekeeping first began in the early part of 1958, after defendant became pregnant. And while he minimized defendant's pre-natal illness it was developed from him that during that time she had the usual morning illness, as well as a case of food poisoning for which she was confined to her bed for a time and required medicine prescribed by her physician. As to the laundry, it was brought out that when plaintiff returned home the defendant would have the diapers soaking in a pail; that they had to be taken to the trailer camp wash house, where the ringers were located, to be wrung out; that the ringers were hand-operated, and most of them didn't work; and that the defendant never asked him to take care of them, but that defendant would "infer" they were there. Plaintiff's only illustration of his complaint of defendant's temper was that when a puppy they had obtained cried at night, defendant hit it with a fly swatter, and the dog became cowed. He was asked a question about the training of a dog, but an objection was made and sustained, and the matter not further pursued. However, his own interest in the dog may be gauged by the fact that he did not know whether or not the dog had been sent to defendant's mother's house, and was unaware of what disposition had been made of the dog. As to the spanking of the child, he described it as having occurred when defendant patted the baby after it ate, "and he (the baby) would regurgitate, then she would spank him," so that it made red marks on the child. Viewed in the light of such circumstances, a question fairly arises as to

whether the so-called spanking was not an effort to prevent the child from choking when it regurgitated. Regarding the attempted suicide, plaintiff claimed that defendant had tried to drown herself in the sink in the bathroom of their trailer, and when pressed to give the size of the sink described it as being only four inches in depth, when full of water, and only six or seven inches in diameter.

It will be recalled that at the time the case was tried defendant's only pleading on file consisted of a plea to the court's jurisdiction, a general denial of the indignities alleged, and a prayer that the custody of the child be awarded to her. That she was distraught and emotionally upset while testifying is evidenced by the fact that during cross-examination plaintiff's counsel requested her "to set back and relax and collect yourself." Whatever may have been the reason—whether a hope that she might effect a reconciliation, her emotional state, her primary desire to obtain custody of her child, inexperience or oversight, it is obvious from the record that important issues were not adequately developed. She was asked relatively few questions concerning the alleged indignities of which plaintiff complained. Plaintiff's association with another woman was strongly suggested, but was not developed in the defendant's case, other than her statement that plaintiff had been "acting up" and "loves another woman." Defendant did testify that she loved plaintiff and did not want a divorce; that she had worshipped her husband, and had treated him with kindness and affection; that she had tried to be a good wife to him; that she turned over her allotment check of $137.10 to him each month, and let him take care of the money and the bills, because she wanted him to feel he was the head of the house; that she always prepared his meals on time; that despite her doctor's advice not to engage in sexual relations for a period after childbirth, she did so within the stated time to satisfy the plaintiff. (On cross-examination the plaintiff had denied such marital relations within the forbidden time or that defendant thereby contracted a vaginal infection, and while admitting that an infection occurred, contended that it was an aftermath of the childbirth.) She testified further that while she had demurred at the plaintiff's mention of going to the paratrooper's school, because it was dangerous and she loved him so much, she did not object strenuously or argue with him, or discuss it more than twice.

The major portion of defendant's testimony was devoted to the events surrounding her surrender of the child to Mrs. Martha Shea, plaintiff's mother, on September 7, 1958, and her unavailing efforts to subsequently regain his custody or to even see him. According to plaintiff, without any preliminary discussion, the defendant suddenly telephoned Mrs. Shea on the evening of Friday, September 5, 1958, and requested Mrs. Shea to come and get the baby, stating that she didn't want the child and couldn't take care of him. Mrs. Shea confirmed this telephone conversation with defendant. Plaintiff and his mother testified that upon Mrs. Shea's arrival in Chesapeake, defendant reiterated her request that Mrs. Shea take the baby to her home, and that, accordingly, Mrs. Shea flew back to St. Louis with the child the next day, Sunday, September 7, 1958.

Defendant categorically denied that she had agreed to permanently give up the custody of the baby. She testified that because plaintiff had been acting up and loved another woman, she telephoned Mrs. Shea on September 5, 1958, to ask Mrs. Shea to come to Chesapeake to have a talk with plaintiff; and that all that was said about the baby in that conversation was that he was a little upset. Defendant testified further that after the plaintiff's mother arrived in Chesapeake, Mrs. Shea told the parties she would take a week off from her employment and said "Listen, kids, you take a second honeymoon, and I'll take the baby for a week," and that on that understanding she let Mrs. Shea take the baby.

The studied and adamant refusal of the members of plaintiff's family to subsequently permit defendant even a glimpse of her child tend to support her charges that the baby had been obtained from her by a ruse, and as part of a pre-conceived plan for the institution of a suit for divorce. When plaintiff first informed defendant, on the morning after his mother had left with the baby, that he intended to file this action for a divorce, she did not at first take him seriously. But when she realized that he was firm in his intentions, she informed him that she would need money to go get her baby. Defendant testified, and we are inclined to believe her, that plaintiff left her penniless; that she had to borrow money from her neighbors to go to her parent's home who gave her the money to come to St. Louis, arriving about September 9 or 10. Defendant attempted to contact Mrs. Shea both at her home and at her place of employment. She did go to the home of Mrs. Shea and was told by Mrs. Sasseen, Mrs. Shea's sister, that plaintiff had been there and had obtained the baby, and was returning to Chesapeake, and that Mrs. Shea was following on the bus. Mrs. Sasseen admitted that she had so informed defendant, stating that she had called the family attorney "to check," and that she was "under the impression" that plaintiff had obtained the baby. Yet that conversation took place in the family home, where the baby was kept at all times following his arrival in St. Louis.

Defendant, having limited funds, returned to her parent's home and came back to St. Louis with her father. They proceeded to Mrs. Shea's home, but were refused permission to enter or to see the baby by Mrs. Lotz. Apparently defendant and her father then sought the aid of the police in their efforts to at least see the child, and were advised to consult the "Juvenile Court." Upon doing so they were informed that plaintiff had filed this divorce action, and that the court had issued an order "holding my baby."

The record shows that the same day the petition was filed the court; ex parte and on its own motion, entered an order awarding the custody of the child to Mrs. Shea enjoining and restraining the defendant from taking the child out of the jurisdiction of the court and "from interfering with said minor," until the further order of the court. Defendant then returned to Chesapeake, subsequently returned to St. Louis and employed an attorney. In company with someone from her attorney's office she returned to Mrs. Shea's home, asked to see the child and again was refused. The following day she and her attorney again returned to Mrs. Shea's home, and in the presence of plaintiff's counsel she begged to be allowed to see the child, if only through the screen door, but her request was refused. It is difficult to conceive of more cruel and heartless treatment of a mothër than the deliberate and unjustified refusal to let her at least have a glimpse of her four-month old baby. To the credit of the trial court it must be said that upon the conclusion of the trial, the court called an immediate conference of the counsel in the case, and that the parties thereupon stipulated that defendant would be allowed a limited right of visitation.

We try a case of this kind de novo. Ordinarily, where there is a sharp conflict in the evidence, we recognize and adhere to the rule of deference, since the trial court had an opportunity to observe the witnesses. Clemens v. Clemens, Mo., 235 S.W.2d 342. But it is our duty and responsibility to review the evidence, and, if possible, reach our own conclusions therefrom. Clemens v. Clemens, supra; Bassett v. Bassett, Mo., 280 S.W. 430.

Cases of this nature address themselves to the conscience of the court. Bassett v. Bassett, supra; Scholl v. Scholl, 194 Mo.App. 559, 185 S.W. 762. It is difficult to precisely define indignities, the grounds upon which plaintiff sought a divorce. Certainly the term connotes such

action on the part of one spouse as to amount to a species of mental or physical cruelty, or of injury accompanied with insult or hatred. Bassett v. Bassett, supra. In any case, the uncorroborated incidents or actions of which complaint is made must be considered in the appropriate setting of their background. Clemens v. Clemens, supra. Viewing the evidence as a whole, we are extremely doubtful that it demonstrates with convincing probative force that it amounted to a species of mental cruelty, or that plaintiff's condition in life was rendered intolerable. At best, the incidents he described were in the main but examples of the stresses and strains which frequently occur during the prenatal and post-natal period, particularly in connection with the birth of a first child. It is probable that their living conditions may have served to increase their tensions, but it is likewise probable that the strain on defendant was far greater, confined as she was to a trailer during her pregnancy, in a strange town, without friends or family to aid her, and having to cope, after its birth, with a child that became ill. Furthermore; plaintiff was no stranger to the marital venture, this being his third marriage, whereas defendant had not been married before. Men should be tolerant and considerate, not critical or censorous, during such a trying time in a woman's life. Scholl v. Scholl, supra.

While both plaintiff and his mother denied that the custody of the child had been obtained by a ruse, their testimony lacked that what was so aptly described in Clemens v. Clemens, Mo., 235 S.W.2d 342, 346, as " * * * that naturally compelling ring of sincerity * * * ". Mrs. Shea testified, for example, that on September 5, 1958, when defendant first requested her to take the child, she immediately consulted her attorney and was advised not to do so unless a consent was obtained in writing. She claimed that she took a form of written consent with her to Chesapeake. Yet despite Mrs. Shea's testimony that defendant repeatedly reiterated the alleged request that she take the child, Mrs. Shea admitted that she had not even approached the defendant about the written consent, and offered no explanation as to why she had acted contrary to the claimed advice of her attorney.

■ Finally, with all due deference to the trial court, we are unable to understand the basis of its award of custody of this very young baby to its father, a professional soldier. It requires no citation of authority to demonstrate that unless there is some compelling reason to the contrary, it is the policy of the courts to award the custody of children of tender years to their mother. Particularly when, as here, the evidence showed that the home defendant could provide for him, with her parents in West Virginia, would seem more desirable surroundings than the family residence in which plaintiff's mother lived.

■ Because the issues presented were not adequately developed below, the record before us is such that it is impossible for us to render a judgment which would finally dispose of the case. In such a situation, in the interests of justice, the only course of action open to us is to remand the case for a proper development of the issues in a new trial. Ample authority exists for such a procedure. Niedergerke v. Niedergerke, Mo.App., 271 S.W.2d 204; Erlacher v. Erlacher, Mo.App., 145 S.W. 2d 974.

It is therefore the recommendation of the Commissioner that the judgment be reversed and the cause remanded for a new trial.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

Accordingly, the judgment is reversed and the cause remanded for a new trial.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.