## HORATIO P. VAN CLEVE AND OTHERS v. W. GLEN WALLACE.[1]

February 25, 1944.

No. 33,674.

*Covell & Root* and *George A. French,* for appellants.
*John A. Goldie* and *Samuel I. Sigal,* for respondent.

MAGNEY, JUSTICE.

*Quo warranto* to test the right of respondent, W. Glen Wallace, to hold the office of president of the city council of Minneapolis. The appeal is from a judgment in favor of respondent.

The facts are these: the terms of aldermen in the city of Minneapolis are staggered, one from each of the 13 wards being elected for a four-year term in June of the odd-numbered years. The council organizes itself on the first Monday of July following the election, the newly elected aldermen taking office that day. In June 1939 respondent was elected alderman from the second ward for a term of four years. At the organization meeting in July 1941

[1]Reported in 13 N. W. (2d) 467.

he was elected president of the council. At the general city election in June 1943 he was reëlected alderman and took the oath of office prior to the organization meeting, which was held on July 6. When that meeting convened, respondent was in the chair. Alderman Pratt, one of the appellants, asked for a ruling from the city attorney as to whether respondent was rightfully in the chair. The city attorney replied that he had a written opinion from the attorney general holding that respondent had a right to continue in the chair. This opinion was read by the city clerk to the members of the council. Respondent then ruled that he was entitled to the chair. Thereupon the council proceeded to ballot for president. On the first ballot, Arthur B. Fruen received 13 votes and respondent 13 votes. On the second ballot, Fruen received 13 votes, respondent 12 votes, and there was one blank ballot. The chair declared that there was no election, taking the position that the election of a president required a majority of all the 26 aldermen, or 14 votes. On the third ballot, Fruen received 13 votes and respondent 13 votes, and the chair declared no election. The council proceedings disclose that there was no objection to taking the third ballot. After the third ballot, Alderman Pratt for himself and on behalf of the other appellants raised the point of order that Alderman Fruen had been elected president on the second ballot and insisted that he be declared so elected by the chair. The opinion of the city attorney, who was present, was that Fruen had not been elected on the second ballot. He held that it required the affirmative vote of the majority of all members of the city council. The balloting continued to and included the 38th ballot. The subsequent ballots all resulted in 13 votes for Fruen and 13 for respondent, except the 34th, which gave respondent 13 votes, Fruen 12, and one blank. In each case respondent ruled that there was no election. After the 38th, there was no further balloting.

Minneapolis is a city of the first class and has been governed under a home-rule charter since November 1920. Prior to 1920 it operated under a legislative charter.

■ Appellants first contend that under the provisions of the charter Alderman Fruen was elected president of the council on the second ballot. Respondent denies this claim and insists that Fruen was not elected president on the second ballot; that 14 affirmative votes are necessary to elect a president; and that at no time did Fruen receive more than 13 votes.

Chapter II of the charter is entitled: "OFFICERS—ELECTIONS." Section 1 of that chapter provides for the election of certain officers by a vote of the people, namely, the mayor, 26 aldermen, and certain other elective officers.

Section 2 reads as follows:

"**Council to Appoint City Officers—Terms of Office.**—Except as in this Charter otherwise specifically provided, all other officers provided for in this Charter or deemed necessary for the proper management of the affairs of the city, shall be appointed by the City Council. The appointment of such officers shall be determined by ballot and it shall require the affirmative vote of a majority of all members of the City Council to appoint such officers. All officers required to be appointed by the City Council, shall, unless in this Charter otherwise provided, hold their respective offices for the term of two years from and after the first Monday of July of the year of their appointment, and all officers elected by the people, or appointed by the City Council or otherwise, shall continue in office until their successors are elected or appointed and have qualified. * * *"

The question which arises at the outset is whether the president of the council is an *officer* within the meaning of this section. If he is, 14 affirmative votes in a council of 26 are required to elect. Appellants contend, however, that the president is not an *officer* within the meaning of the charter; that it makes no provision for the number of votes necessary to elect a president; and that therefore Robert's Rules of Order govern.

Rule 18 of the standing rules of the council provides:

"The rules of parliamentary practice, embraced in Robert's

Rules of Order, Revised, shall govern the Council in all cases to which they are applicable and in which they are not inconsistent with these rules."

Under Robert's Rules, a majority affirmative vote of the quorum is all that is required to elect a presiding officer. Fourteen members of the Minneapolis city council constitute a quorum.

In order to determine this disputed question, it becomes necessary to consider provisions of the charter other than the one quoted. Chapter III, entitled: "POWERS AND DUTIES OF OFFICERS," is divided into 28 sections. Section 1 pertains to the powers and duties of the mayor. Section 2 provides:

"**City Council—Election of President and Vice-President—Their Duties.**—At the first meeting of the City Council in July of each year after a general municipal election they shall proceed to elect by ballot from their members a President and Vice-President. The President shall preside over the meetings of the City Council and during the absence of the Mayor from the city or his inability for any reason to discharge the duties of his office the said President shall exercise all the power and discharge all the duties of the Mayor. In case the President shall be absent from any meeting of the City Council, the Vice-President shall discharge the duties of such President and act in his place. The President or temporary presiding officer while performing the duties of Mayor shall be styled *acting Mayor, and acts performed by him when acting as Mayor as aforesaid shall have the same force and validity as if performed by the Mayor."* (Italics supplied.)

Appellants insist that chapter III defines the powers and duties of the city council only. That is not a correct interpretation of the chapter or its title. Section 2 clearly defines the duties of president and vice-president of the council and is, as stated, only part of a chapter which is entitled: "POWERS AND DUTIES OF OFFICERS." The charter classifies the president of the council as an *officer,* and no reason appears to us why the court should not do so also.

The powers and duties of the city council are specifically defined in chapter IV. That chapter is entitled: "CITY COUNCIL—POWERS—DUTIES, ETC.," while chapter III is entitled: "POWERS AND DUTIES OF OFFICERS." Section 5 of chapter III throws further light on this proposition. It reads as follows:

"City Attorney—Appointment—Powers and Duties.—The City Council shall at the time *and in the manner specified in this chapter for the appointment of other city officers* elect and appoint a City Attorney." (Italics supplied.)

The only section which specifically sets forth the time and manner of election or appointment of any officer mentioned in chapter III is section 2, which refers to the election of president and vice-president of the council. It is apparent that the president of the council is an *officer* under the very provisions of the charter and designated as such. It may be true that he is an officer of a different character from that of the officers enumerated in chapter III, but he is still an officer. The office of president of the council has a status and dignity of its own. As presiding officer or "moderator," he is the officer and agent of the council; but as acting mayor or "vice-mayor," if we may use that term, he is not an officer of the council, but of the city. In the absence of the mayor from the city or his inability to act as mayor, the president of the council *"shall exercise all the power and discharge all the duties of the Mayor."* He acts while there still is a mayor. He is more than a mere alderman. The charter (chapter III, section 2) provides that the "President * * * shall be styled *acting Mayor* [italics supplied], and acts performed by him when acting as Mayor as aforesaid shall have the same force and validity as if performed by the Mayor." Acting in this capacity, he cannot be considered a mere agent or officer *of* the council. He acts *as* an officer of the city, and, in case of a vacancy, he becomes the mayor. The president of the council is more than a mere presiding officer such as contemplated under Robert's Rules of Order.

As has been shown, the charter in chapter III designates the president of the council an *officer*. To be elected, must he receive

an affirmative vote of the majority of all the members of the council?

Section 2 of chapter II has already been quoted, but, for the sake of convenience, a portion of it will be restated:

"Council to Appoint City Officers—Terms of Office.—Except as in this Charter otherwise specifically provided, all other officers provided for in this Charter or deemed necessary for the proper management of the affairs of the city, shall be appointed by the City Council. The appointment of such officers shall be determined by ballot and it shall require the affirmative vote of a majority of all members of the City Council to appoint such officers. * * *"

We have already seen that chapter III designates the president of the council an officer, and we have determined that he is an officer of the *municipality* provided for in the charter and not a mere agent or officer of the *council*. He is also an officer necessary for the proper functioning of the city government. If he is an officer provided for in the charter or deemed necessary for the proper management of the affairs of the city, his election must be determined by ballot as provided in section 2 of chapter II and section 2 of chapter III, and it requires the affirmative vote of a majority of all members of the council to elect. Appellants contend that section 2, chapter II, applies only to officers appointed and not to those elected. Not much consideration need be given this contention. The words "appointed" and "elected" are used interchangeably. They are so used in this charter. In section 5 of chapter III both words are used in connection with the selection of a city attorney. Section 5 provides: "The City Council shall * * * elect and appoint a City Attorney." Section 3 of chapter III provides that a city clerk shall be "elected" by the council. No one can contend that the city clerk is not to be selected in accordance with the provisions of section 2 of chapter II.

As to method of appointment of officers, the charter provides (section 2, chapter II) that they shall be appointed as in that section provided, "Except as in this Charter otherwise *specifically*

provided." No section of the charter does "otherwise specifically" provide.

In his supplemental opinion given on July 3, 1943, to the city attorney, the attorney general stated:

"* * * If the provisions of Section 2 of Chapter 2 require a majority vote of the city council to elect a city attorney; if this provision applies to the other officers mentioned in said Chapter 3, it appears to me that the same provision should apply to the president and vice president of the city council whose offices are created by the same Chapter 3."

If that were not true, all the other officers mentioned in chapter III would require an affirmative vote of the majority of all the members of the council for appointment or election, but the president and vice-president alone could be elected by a lesser vote. There is no good reason for a distinction. As we have shown, the office of president is an important office. He is more than a mere presiding officer of the council. The history of the elections of president of the city council for many years indicates that the members of the council, and the public as well, have considered the office of prime importance. The present controversy and litigation can be accounted for on no other sensible basis. Judge Rue in his memorandum states:

"* * * The conclusion then seems to be inevitable that the president of the Council of the city of Minneapolis is an official, an officer of some kind, although perhaps not an officer of the city with the same status as one elected by the people, * * *"

And the attorney general in his supplemental opinion makes these comments:

"While the president and vice president of the council may not be city officers in the usual meaning of that term (see State ex rel. Childs v. Kiichli, 53 Minn. 147 [54 N. W. 1069]), yet they are officers of the council selected and chosen by the council and are

agents of the city, and in my judgment the provisions of Section 2 of Chapter 2 of the city charter apply to their election.

*   *   *   *   *

"It would not be desirable to have a situation where the president of the council who might become mayor could be elected by a minority of the entire membership. That would put it in the power of the minority to appoint a successor in office to the mayor in case of a vacancy in the latter office."

The words "all other officers provided for in this Charter or deemed necessary for the proper management of the affairs of the city" are comprehensive and all-inclusive. The only exception stated is in the phrase "except as in this Charter otherwise specifically provided." The charter contains no exception. The president of the council must be considered an officer "provided for in this charter."

The charter specifically provides that no appropriations shall be made without a vote of a majority of all the members of the council in its favor. It also provides that all ordinances and resolutions of the council shall be passed by an affirmative vote of a majority of all the members of the council and that the power to grant a franchise shall be exercised only by ordinance adopted by a majority of all the members of the council. In making appropriations, in passing ordinances and resolutions, and in granting franchises, the charter is specific in requiring an affirmative vote of a majority of all the members of the council. As we have already indicated, in appointing officers, an affirmative vote of the majority of all the members of the council is also required. Thus, in performing the functions of the Minneapolis municipal government, the council can act only through the affirmative vote of the majority of all its members. From the spirit of the charter itself and its specific provisions, we find no basis for the contention that in the election of a president of the council an affirmative vote of the majority of the quorum is all that is required.

As the charter itself provides a method for the selection of a president of the council, Robert's Rules of Order are not applicable.

508

In State ex rel. Peterson v. Hoppe, 194 Minn. 186, 260 N. W. 215, 216, the rule governing was expressed in the syllabus:

"Where by charter or statute the vote of a majority of the members of the council is required to give effect to a measure, such measure cannot be enacted by a mere majority of a quorum unless those voting for the measure also constitute a majority of all the members of the council, both present and absent."

Since we have determined that under the charter itself the president of the council is an officer and that an affirmative vote of the majority of all the members of the council is necessary to elect him, no occasion arises to consider the practical construction given the charter. It is, however, interesting and illuminating to do so. It supports our position. If we should consider the practical construction given the charter by the city council the result would be the same as here found. The trial court based its decision entirely upon the wording of the charter. The contemporaneous interpretation of the charter provisions at the first organization meeting of the council in 1921 after the adoption of the home-rule charter is entitled to considerable weight. To elect a president of the council, 177 ballots were required. On each and every ballot the council proceedings showed: "Necessary to choice 14." In all council proceedings recording the vote given for candidates for the office of president of a council of 26 members, there is noted: "Necessary to choice 14." When a vacancy existed and there were, therefore, only 25 members of the council, the minutes of the proceedings showed: "Necessary to choice 13." Only in two instances since the adoption of the home-rule charter in 1920 was a president elected by less than a majority of all the members of the council. In the organization meeting after the 1923 election, Theodore E. Jenson received 13 votes, Arthur B. Fruen, 11, and there were two blanks. The minutes show: "Necessary to choice 14." At the following meeting of the council, the city attorney ruled that Jenson had been elected on the 13th ballot. Arthur B. Fruen, the defeated candidate, who is one of the plaintiffs in this action and the one who claims that he was elected president on the second

ballot in the 1943 organization meeting, brought an action to test
the validity of the election of Jenson as president. In his verified
complaint he stated:

"That it has long been the uniform custom and usage of said
Councils of said City of Minneapolis that a president of that body
shall not be deemed elected except upon the vote of at least
fourteen members of said City Council; the total membership of
that body now being and long having been twenty-six, and that
at the said meeting on July 2nd, 1923, the Defendant herein did
not receive, nor did any other person receive, fourteen votes in his
favor for election to the office of president of said City Council.
And Plaintiff further alleges that the acting chairman of the
aforesaid meeting of said City Council, at which the balloting for
the election of a president was had, ruled that there was no elec-
tion of a president, and each and every member of said City Council
acquiesced in and accepted said ruling, and said meeting was duly
adjourned without the election of a president of said body, and
without the rulings of the chairman at said meeting being ap-
pealed from or in any manner overruled."

For reasons not shown, plaintiff Fruen dismissed his action a few
days later.

At the organization meeting following the 1933 election, one
alderman was unable to attend because of illness, and 12 withdrew
from the meeting. The remaining 13 elected William A. Currie
president of the council. There was no quorum present, and neither
under the charter nor under Robert's Rules of Order was that
election valid. Henry H. Bank brought an action, not as alderman
but as taxpayer, to enjoin the city clerk from publishing the
minutes of the proceedings and the president and vice-president
selected at the meeting from acting. Judge Baldwin denied the
motion for a temporary injunction. He held that the action was
an equitable one, and an appeal to the conscience of the court for
an extraordinary remedy. He stated in his memorandum:

"To grant the relief asked would be but to approve a method

of procedure wholly at variance with the theories of government under which we live and to grant to the plaintiff relief from a situation which he himself helped to create.

"And there is a further reason why the relief should not be granted. It is not necessary. The Council still has all its powers to function."

It is, of course, apparent that the court did not consider the question here involved. A day or two after Judge Baldwin filed his decision the city council adopted his suggestion. Currie resigned as president of the council, and Alderman Blomberg was elected president with 15 votes. There were 25 votes cast, and the minutes showed 14 votes necessary to choice.

At the organization meeting after the 1939 election, the sixth ballot gave the following result: Kline 13, Hoyer 12, and one blank. The point was raised that Kline had been elected on the sixth ballot. The chair ruled otherwise. Thereafter Kline was elected by 24 votes. At the organization meeting after the 1941 election, the question again arose. The city attorney was asked for an opinion. He adhered to the rule followed two years previously that it must be an affirmative vote of the majority of all the members of the body to elect the officer. The procedural history of the council, except for slight deviation, is consistent with the practice of requiring an affirmative vote of the majority of all the members to elect a president.

■ The next question raised by this appeal is whether respondent holds over as president of the council until a successor is duly elected and has qualified. Appellants contend that he is not and cannot be president, because his term as alderman, during which he was elected president, expired, and with its expiration his term of office as president terminated. Respondent had taken the oath of office prior to the expiration of his term. There was no actual break between his two terms. Since the council was evenly divided and unable to elect a successor to him, there is every reason why he should hold over. The council probably could not agree to elect even a temporary chairman, because of its even division.

We have already concluded that the president of the council is an officer. Chapter II, section 2, of the charter, provides that *"all officers elected by the people, or appointed by the City Council or otherwise,* shall continue in office until their successors are elected or appointed and have qualified." (Italics supplied.) There is nothing in that language which excludes the president of the council. The city council is a body unlike the congress of the United States and the legislature of the state. As each congress expires at the end of its two-year period, the new congress organizes itself anew. The terms of the entire membership of the house of representatives expire at the end of two years. The same is true of the state legislature. The city council, however, is a continuous body. In 37 Am. Jur., Municipal Corporations, § 50, it is stated:

"A municipal council is not, like the legislature of a state, a body which exists only during the term for which its members are elected, and which is created anew at each election, but is a continuous body although its membership may be changed every year, or at some other period. As a result of this principle, business begun in a municipal council may be completed after its members have gone out of office and a new council has been elected."

In 43 C. J., Municipal Corporations, § 743, we find this statement:

"* * * A municipal corporation is never without its governing body; and this body when duly organized is a continuous body, although there may be changes in its membership by reason of the expiration of the terms of its members, or because of vacancies occasioned by death, removal, or other causes."

It has been held that the expiration of the terms of all members at the same time does not prevent the council from being a continuous body. A new council may take up proceedings where they were left by the old council. State v. City of Bayonne, 56 N. J. L. 268, 28 A. 381. This court, in Manley v. Scott, 108 Minn. 142, 121 N. W. 628, 29 L.R.A.(N.S.) 652, held that the board of county commissioners of Hennepin county is a continuing body and the

election of new commissioners has no other legal effect than partially to change the personnel of the body. That is equally true of a city council. See Ambrozich v. City of Eveleth, 200 Minn. 473, 274 N. W. 635, 112 A. L. R. 269. If the city council is a continuous body and the election of new councilmen has no other legal effect than partially to change the personnel of the body, there seems no good reason why a president of the council, who has been reëlected, should not continue in office until his successor has been elected and qualified. If respondent had failed of reëlection, he would have lost his qualification; and, naturally, if he lacked the legal qualifications to act as president of the council, he could not so act. One must be a member of the council to be president of it. It cannot be assumed that a city council can function without a presiding officer. It is entirely natural that the president should continue to hold over.

Nothing to the contrary in the charter appearing, respondent continued in the position of president until the election of his successor. When the council met to organize in July 1943, at which time his successor was to be chosen, he was the duly authorized and qualified person to preside.

Section 2, chapter II, has this provision:

"* * * All officers required to be appointed by the City Council, shall, *unless in this Charter otherwise provided,* hold their respective offices for the term of two years from and after the first Monday of July of the year of their appointment, and all officers elected by the people, or appointed by the City Council or otherwise, shall continue in office until their successors are elected or appointed and have qualified." (Italics supplied.)

Appellants contend that under the provisions of this quoted provision the president of the council cannot possibly be considered an officer of the city. They say that all officers required to be appointed by the city shall hold their office for the term of two years, whereas the president of the council is removable at will. As a matter of fact, the officers required to be appointed by the city

council are all removable at will, although appointed for a two-year term. Section 4 of chapter IV provides:

"The City Council shall have power to remove from office any officer of said city whether appointed by the City Council or elected by the people, but no officer elected by the people shall be removed except for cause, * * *."

From this it is apparent that the charter has "otherwise provided" and that the city council has the power to remove any officer appointed by the council at any time. They are removable at will. The two-year provision simply means that the officer holds the position for two years, unless prior to that time he is removed, and it limits tenure to a term not exceeding two years, or .until successors have been elected or appointed and have qualified. In 14 Am. Jur., Counties, § 25, it is stated:

"* * * As to appointive offices, in the absence of a constitutional or legislative prohibition, the power of removal is regarded as incident to the power of appointment."

As to the tenure of office, we see no distinction between the president of the council and the officers appointed or elected by the council. They are all removable at will at the pleasure of that body.

We are not in disagreement with the result in State ex rel. Childs v. Kiichli, 53 Minn. 147, 54 N. W. 1069, 19 L. R. A. 779, holding that the president of the council is removable at the will or pleasure of that body. We do question the interpretation given to some of the facts. As we have indicated, we think that the president is more than a mere agent or officer of the council, and that by the terms of the charter an intention is indicated to create a city office different from that of mere alderman. In addition, over 50 years of municipal history of Minneapolis since the Kiichli decision corroborates our interpretation. The city council is not deprived of the right of control over its presiding officer. In the Kiichli case the court says (53 Minn. 155, 54 N. W. 1071):

"* * * The words 'office' and 'officer' are terms of vague and

variable import, the meaning of which necessarily varies with the connection in which they are used, and, to determine it correctly in a particular instance, regard must be had to the intention of the statute and the subject-matter in reference to which the terms are used."

There the court simply passed upon the matter of tenure of the president of the city council, and not on the question of procedure for his election.

Appellants also rely on State ex rel. Burdick v. Tyrrell, 158 Wis. 425, 149 N. W. 280, Ann. Cas. 1916E, 270. In that case there was no provision in the charter requiring a majority of the members of the council for the election or appointment of officers by the council. The election of city attorney was involved. The court held a majority of the quorum was all that was necessary to elect. In the instant case, it is agreed that the charter provides that an affirmative vote of the majority of the council is necessary to elect the city attorney, city clerk, and city engineer. Appellants say that the charter provision does not apply to the election of president of the council. We have stated that in our opinion it does apply.

The interests of the people of Minneapolis and how they may best be protected must of course be kept in mind in determining questions of this nature. Appellants' position is that if a quorum be present a majority of those voting may elect, blanks being ignored. If that position were to be sustained, the presiding officer of the council, who acts as mayor in the latter's absence or his inability to act, might be a person whose election represented only a minority vote of the council membership. That is not desirable. It is our view that, under the provisions of the charter itself, an affirmative vote of a majority of the members of the council is required to elect, and it seems to us that position best serves and protects the interests of the people of Minneapolis. The holding that the president of the council, if reëlected as alderman, continues in office until his successor is elected also best serves and protects the same interests. We have in mind the rule stated by this court

in Woodbridge v. City of Duluth, 121 Minn. 99, 102, 103, 140 N. W. 182, 183, where this court stated:

"* * * it is undesirable and out of accord with judicial determination, from the earliest times, that any interregnum should be allowed to exist in the transition of forms of government or change of officers.

\*    \*    \*    \*    \*

"Questions involving government must not be determined along technical lines. Practical and broad considerations should control."

Here the council is equally divided. Respondent has duly qualified as an alderman. If practical considerations should control, he should continue to act until his successor has been elected and has qualified. As this court stated in State ex rel. Smallwood v. Windom, 131 Minn. 401, 406, 155 N. W. 629, 631: "In the interest of the public service it may be that the incumbent should continue the performance of his duties."

Several other questions have been raised in the able presentations by counsel in their briefs and oral arguments, but enough have been considered by us to determine the questions presented.

Judgment affirmed.

LORING, CHIEF JUSTICE (concurring specially).

I agree with the result solely on the ground that respondent is such an officer that when reëlected as alderman he holds over as president of the council and that it requires a majority of the members to elect his successor. Further than that I do not think we should go, or that we should overrule Justice Mitchell's sound opinion in State ex rel. Childs v. Kiichli, 53 Minn. 147, 54 N. W. 1069, 19 L. R. A. 779.

JULIUS J. OLSON, JUSTICE (concurring specially).

I concur in the views of the Chief Justice.

MR. JUSTICE STREISSGUTH took no part in the consideration or decision of this case.