**STATE of Missouri upon the Information of Daniel P. REARDON, Jr., Circuit Attorney of the City of St. Louis, (Plaintiff) Respondent,**

v.

**A. Barney MUELLER, (Defendant) Appellant.**

**No. 31924.**

St. Louis Court of Appeals.

Missouri.

Jan. 19, 1965.

Motion for Rehearing and Transfer to Supreme Court Denied Feb. 12, 1965.

Application to Transfer Denied April 12, 1965.

Thompson, Walther & Shewmaker, Richard D. Shewmaker, John Gianoulakis, St. Louis, for appellant.

Daniel P. Reardon, Jr., Circuit Atty., Michael M. Flavin, Asst. Circuit Atty., for respondent.

L. F. COTTEY, Special Judge.

The State of Missouri challenges the right of A. Barney Mueller to hold the office of Alderman of the Twenty-First Ward in the City of St. Louis, to which he was elected for a third consecutive term in 1961. The action is based on Article IV, Section 2, of the City Charter, reading in pertinent part as follows:

"No person shall become an Alderman except he be * * * a resident of the ward from which elected * * * and if any Alderman * * * shall at any

time not be a resident of such ward, he shall thereby forfeit his office * * *."

The information charges that Mr. Mueller has forfeited his office by reason of the fact that he is not, and for some time prior to his last election has not been, a resident of the Twenty-First Ward, but has actually resided during all that time in the First Ward of the city. By his answer Mr. Mueller concedes that at all times mentioned in the information he "has maintained a dwelling place for his family, including himself, at 1632 Veronica Avenue" in the First Ward, but he avers that it is not his legal residence and specifically denies that he is not a bona fide resident of the Twenty-First Ward. After the pleadings were made up, Mr. Mueller's deposition was taken. The Circuit Attorney, upon whose information the action was instituted, thereupon moved for summary judgment on the ground that all of the material facts pleaded in the information had been confessed, either by the answer or by the deposition, so that no "genuine issue" remained to be litigated; consequently, "that the plaintiff is by unassailable proof entitled to judgment as a matter of law" under Supreme Court Rule 74.04, V.A.M.R. Mr. Mueller responded by affidavit, as the Rule requires, and the record as thus completed establishes the following facts.

At some undisclosed date prior to his latest election Mr. Mueller and his wife bought a residence property at 1632 Veronica Avenue, in the First Ward. It is "a normal family dwelling," and was acquired by them as a place "to raise our family." He and his wife and their three children have ever since "been housed" there. This is the house which is used by the family "as their normal spot of dwelling;" they eat and sleep there. Mr. Mueller is not separated from his wife; on the contrary he leads a "normal life as husband and father," and, in that connection, "provides a home for his wife and children" at the Veronica Avenue address. That is the place where his "family dwells;" that

is the place where his own "home life is conducted." Mr. Mueller's duties oblige him to be absent from that dwelling during the usual hours of each working day, but his normal practice is to return there for his evening meal, spend the night there except on very rare occasions, and take his breakfast there. During all the time with which we are concerned he has "lived a normal family life at 1632 Veronica."

Mr. Mueller insists, however, that he considers his "legal residence" to be at 3801a Lee Avenue, in the Twenty-First Ward. At that address there is a three story brick business building in which, some sixty-five years ago, Mr. Mueller's father established a retail drug business which occupied the ground floor. At that time the elder Mr. Mueller and his family lived upstairs; but many years ago they moved to a house across the street where he and his wife afterwards died. Since that time the house has not been occupied by any member of the family. The drug store, however, has remained at its original location and is currently operated by Mr. Mueller's brothers, Cornelius and John, and his sister, Mrs. Steck, who lease the entire building from its present owner. The two upper floors of the building are used principally for the storage of merchandise and supplies used in the drug store. Mr. Mueller occasionally "helps out" as a clerk in the drug store, but he has no financial interest in the business. For an undisclosed length of time his brothers and sister have allowed him to use three rooms on the second floor of the building as "an apartment that is capable of being inhabited by a person or family." The apartment is reached by a stairway that is accessible both from the drug store premises and from an outside entrance on Prairie Avenue. At the head of the stairs there is a toilet, apparently the only one in the building, and adjoining it is a washroom containing a lavatory, but no other facilities so far as the record discloses. Down the hall are Mr. Mueller's "living room and bedroom fully furnished;" the third room of his suite is "half-way furnished," the

remaining space in it being used for the storage of drug supplies. His living room is the room in which he was born during the years his parents lived there. He pays no rent for these quarters. He keeps some clothes in the apartment and some shaving equipment, but he has only spent "about eight" nights there during the past year. On some of those occasions his family was out of town; on others they were at the Veronica Avenue residence. At no time have any members of his family shared the apartment with him. It "is extraordinary" for him "to spend the evening" there. If facilities for cooking exist, it seems they are never used; food is "brought in" whenever needed. Mr. Mueller filed his candidacy from this address and both he and his wife are "registered to vote from" it. So, also, are his two brothers, although admittedly "they don't use it as a place to reside." It is generally known as "the Twenty-First Ward Democratic Headquarters" when Mr. Mueller is conducting a campaign.

On "a normal working day" it has been Mr. Mueller's practice to arise at his Veronica Avenue residence at 7:30 in the morning, eat breakfast there, and then drive down to the drug store. It is "only about seven to ten minutes drive." He arrives "about ten o'clock." There he looks over his mail at a desk he uses in the drug store and makes such telephone calls as are necessary in his business, using the drug store phone; there is neither desk nor phone in his apartment. He confers with his constituents in the drug store until about noon. If the subject under discussion is of a confidential nature, he takes his callers up to his apartment for the conference. After lunch he usually drives to the office of a realtor with whom he is associated and attends to such business as awaits him there. Later in the afternoon he ordinarily makes a call at City Hall to attend to such matters as have been referred to him by his constituents, and then returns to the drug store because, "The people know that that's where they can

reach me in the day at four o'clock unless I have some other business." At 5:30 or thereabouts he goes back to his Veronica Avenue residence for dinner and to spend the evening. Sometimes he is called back to the drug store to confer with a constituent, or just to help his brothers with the trade there, but eventually he returns to the Veronica Avenue dwelling for the night.

In his affidavit Mr. Mueller said, "I intend my living quarters, or apartment, at 3801a Lee Avenue to be my residence. I have intended it to be my residence during my entire present term as alderman and before that." By way of explanation he added, "I have two homes, my apartment at 3801a Lee Avenue and my house at 1632 Veronica," but "the one which I consider my residence is 3801a Lee Avenue."

 Upon that record the trial court sustained plaintiff's motion for summary judgment. Mr. Mueller has appealed, contending that the record does not establish his non-residence in the Twenty-First Ward as a matter of law, but, on the contrary, raises a "genuine issue" as to that fact. "Our duty is the equivalent of reviewing a court tried or equity case, and eventually of resolving the question of the sufficiency of the evidence to support the summary judgment and finally, if necessary, of entering such judgment as the trial court ought to have given." Brown v. Prudential Ins. Co. of America, Mo.App., 375 S.W.2d 623, 628; Swink v. Swink, Mo., 367 S.W.2d 575, 578; Landers v. Smith, Mo.App., 379 S.W.2d 884, 886. "As said in many cases the question of the sufficiency of the evidence raises an issue of law and if under the evidence adduced the court would be compelled to direct a verdict for any of the parties, then said party is entitled to a summary judgment." Brown v. Prudential Ins. Co. of America, supra (375 S.W.2d 1. c. 629.)

 The last cited case, incidentally, dealt with a complaint by the appellant that the entry of summary judgment against him deprived him of the benefit of some

material evidence which he could have produced but, for some reason, did not. Counsel for Mr. Mueller make the same complaint here, and this seems an appropriate time to dispose of it. They say, "We were not called upon and did not purport by affidavit or otherwise to put in all the evidence that might convince the court on a full trial that the allegation that Mr. Mueller is not presently a resident of the Twenty-First Ward cannot be sustained." If true, the omission was unfortunate; but it can scarcely be ascribed to lack of warning. Rule 74.04 expressly provides that the party resisting a motion for summary judgment must come forward with "specific facts showing that there is a genuine issue for trial." "This is the duty imposed upon an adverse party to one moving for a summary judgment." Brown v. Prudential Ins. Co. of America, supra (375 S.W.2d l. c. 632). And if he be remiss in that duty, "summary judgment, if appropriate, shall be entered against him." One who withholds material evidence for reasons of trial strategy or otherwise, gambling on the outcome of the motion, must abide the result if he loses. Counsel also say, "Perhaps we can develop some more facts on a trial." That same suggestion was made in the Brown case and disposed of in this language, (375 S.W. 2d l. c. 633). "It should be noted that if the abstract statement appearing in plaintiff's brief, that he could produce witnesses to refute the proof submitted by the moving party for summary judgment, was acceptable to defeat defendant's judgment, then such a procedure, if tolerated, would completely circumvent the purpose of the rule permitting summary judgments." We must take the record as we find it, then, and do the best we can with what we have.

■ It has been said that the question of legal residence "is often difficult to determine." In re Ozias' Estate, Mo.App., 29 S.W.2d 240, 243; State on Inf. of McKittrick v. Wiley, 349 Mo. 239, 160 S.W.2d 677, 686. It will be found in every case, however, that the difficulty has arisen upon disputed facts, in the determination of which

the credibility of the opposing witnesses has frequently been a factor. Here we do not have that problem. Every fact in the record before us has been furnishd by Mr. Mueller, and his integrity is unquestioned. We have, therefore, the "unassailable proof" referred to in the Rule, and we have only to determine whether it establishes, as a matter of law, that Mr. Mueller is not a resident of the Twenty-First Ward. That will be found to turn on this narrow question, Which of Mr. Mueller's two *claimed* homes is his *real* home? Admonished by the old maxim, "The beginning of knowledge is a definition of terms," we turn first, and with some misgiving, to that task.

■ Perhaps no word in any language is so well understood and yet so imperfectly defined as the word, "home." Interpretation of the concept has occupied the minds of jurists and engaged the imagination of poets in all ages, but none has given it full expression in language harmonious at once in truth and grace. Certain it is, however, that no definition can be complete which omits the element of sentiment, that quality, intangible and elusive though it may be, which nevertheless in the common understanding of a man serves most readily to identify his home and to distinguish it from every other place—that lifts it from an adjunct of living to an object of life—that goes beyond the law's language and animates the image with the breath of family affection and the gentle warmth of hospitality shared with friends, and endows it with comfort in affliction, with respite from care, and the promise of pleasant repose. So, while we must use the definitions that have been given us—that a man's home is his habitation, his place of abode, his domicile as specifically located in a given area— we mean a little more than that. In State v. Savre, 129 Iowa 122, 105 N.W. 387, 388, 3 L.R.A.,N.S., 455, 458, the question was descriptively asked, '[W]here is his home, the home where he lives, and to which he intends to return when absent, or when sick, or when his present engagement ends?" And in partial answer the court said it was

"* * * where he rests when not at work, and spends his evenings and Sundays." In State v. Snyder, 182 Mo. 462, 82 S.W. 12, 28, our Supreme Court adopted this language, "'* * * And it may be safely asserted that where one has a home, as that term is ordinarily used and understood among men, and he habitually resorts to that place for comfort, rest, and relaxation from the cares of business and restoration to health, and there abides in the intervals when business does not call, that is his residence, both in the common and legal meaning of the term.'" In Greene v. Beckwith, 38 Mo. 385, 387, this definition was given, "A man's residence, like his domicil, or usual place of abode, means his home, to and from which he goes and returns, daily, weekly, or habitually, from his ordinary avocations and business, wherever carried on." See also: 77 C.J.S. Residence p. 293, "* * * the residence of a man having a family which he maintains is, prima facie, where the family dwells;" 77 C.J.S. Residence p. 301, "* *, * the principal domestic establishment of an individual;" 28 C.J.S. Domicile § 1, p. 4, "* * * not for a mere special or temporary purpose;" In re Ozias' Estate, supra, (29 S.W.2d l. c. 243) "* * * to which whenever he is absent he has the intention of returning." Finally, we have a statute, § 1.020, V.A.M.S., which defines "place of residence" as "* * * the place where the family of any person shall permanently reside * * *." It is objected to the statute, however, that it refers only to the term as used in the statutory laws of the state, and has no application to the St. Louis City Charter. But the statute merely codifies the presumption of law that would in any event exist without it. 28 C.J.S. Domicile § 16b, p. 37.

We are obliged to say that by all those definitions and standards a compelling case has been made for declaring Mr. Mueller's home on Veronica Avenue as his home *in fact*. He acquired it as a place "to raise our family;" the family have ever since occupied it "as their normal spot of dwelling." It is there he leads a "normal life as husband and father;" it is there his own "home life is conducted." It is there "he rests when not at work, and spends his evenings and Sundays;" it is there "he abides in the intervals when business does not call." It is the place "to and from which he goes and returns daily * * * from his ordinary avocations and business;" to which "he habitually resorts * * * for comfort, rest and relaxation from the cares of business." It is not maintained for any "special or temporary purpose." It is the only place to which he is attached by ties of family affection; it is his "principal domestic establishment."

▆▆▆ Against that conclusion several arguments are advanced. It is first suggested to us, in effect, that Mr. Mueller ought to be permitted to answer for himself the question as to which of his "two homes" is his legal residence. In his brief it is conceded that a man cannot "have two domiciles;" but, counsel explain, "when a person has what Mr. Mueller called 'two homes,' *he can choose between them; his intent is what counts*." (Italics added). We are unable to agree with that proposition. Whatever appearance of plausibility it has it owes to the semantic subtlety of its expression. In support of the first of the italicized phrases it is argued with much ingenuity that Mr. Mueller, in claiming his apartment as his residence, was simply making "a choice of a legal relationship" between his "two homes;" that he had the unqualified right to do so; and that, other considerations being equal, or sufficiently so in his opinion, it was only necessary for him to conceive the appropriate intent in order to validate the choice. Except in special circumstances which do not exist in this case, the word "home" is synonymous with "domicile" and "residence." 28 C.J.S. Domicile § 1, p. 2, 4. We have used those terms interchangeably. If we are to be on common ground it must be assumed that counsel, in framing their proposition, have likewise intended those terms to be synonymous, as their use elsewhere in the brief in-

dicates. With that understanding it becomes immediately apparent that the proposition holds for an impossibility; that it is a contradiction in terms. As counsel concede and the law affirms, "* * * a person can have only one domicile at any given time." 28 C.J.S. Domicile § 3, p. 8. A "choice between" domiciles is therefore a paradox, because the number necessary to allow for any choice to be made can never exist at any given time. One might with the same plausibility, or lack of it, speak of choosing between his *two wives*. The illusion which the statement is intended to convey seems itself to be the product of a misinterpretation of the cases cited in support of it: In re Ozias' Estate, supra; Barrett v. Parks, 352 Mo. 974, 180 S.W.2d 665; Barth v. Barth, Mo.App., 189 S.W.2d 451; Kokinakis v. Kokinakis, Mo.App., 180 S.W. 2d 243; State v. Snyder, supra; State ex rel. Kelly v. Shepperd, 218 Mo. 656, 117 S.W. 1169; Schneider v. Friend, Mo.App., 361 S.W.2d 308; Chariton County v. Moberly, 59 Mo. 238. In those cases, and in a number of others cited in the briefs, the householder was shown to have been maintaining two establishments with similar characteristics of domesticity. In each case the court determined from the evidence that one of the establishments was his real domicile and the other merely a claimed or fictitious one. In some, the decision was close; in several, the results are not easily reconciled. But in none was the householder allowed to dictate the decision by announcing which of his establishments he would elect to invest with the status of "legal residence," and in none did he contend for that privilege.

The common understanding of the word "domicile"—as a thing of reasonable stability, useful in the orderly regulation of society—repels the notion that it is, after all, nothing but a weathercock, responsive to the whim of the householder and veering with every change of mind self-interest may prompt him to indulge. If Mr. Mueller, for instance, can, by nothing more tangible or demonstrable than a mental exercise, fix his domicile today in the Twenty-First Ward by virtue of his apartment there, what is to prevent him tomorrow from changing it with equal facility to the First Ward where his dwelling is, and, upon the appearance of advantage the following day, from switching it back again by the same process? Obviously the trouble with the formula proposed to us, aside from the criticism already made of it, is that it contains no requirement of good faith, and no safeguard against that omission. It would allow the choice to be made between a real and a fictitious domicile, or in furtherance of some special purpose; or at any rate it prescribes no method by which that design could be detected and thwarted. The law demands a more discriminating rule. In State of Texas v. State of Florida, 306 U.S. 398, 59 S.Ct. 563, 83 L.Ed. 817, 121 A.L.R. 1179, 1195, the court said, "He (the householder) could not elect to make his home in one place in point of interest and attachment and for the general purposes of life, and in another, where he in fact had no residence, for the (special) purpose of taxation." (Parenthetical matter added). And in disposing of the question of a fictitious home the court, State v. Savre, supra, 105 N.W. 1. c. 388, 3 L.R.A.,N.S., 1. c. 458, said, "A person cannot live in one place and by force of imagination constitute some other his place of abode; * * * the actual place of residence controls, and *one cannot be improvised by merely forming an intention to claim it elsewhere.*" (Italics added). No formula for disposing of cases of this kind, therefore, which ignores the householder's good faith, or lack of it, or the purpose for which his claim of domicile is made, or which facilitates the concealment of those factors, will satisfy the demands of the law.

■ The second part of the thesis— "his intent is what counts"—is of a piece with the first. It has the appearance of being unexceptionable, but as the argument proceeds it becomes evident that we are invited to interpret it as though it read, "his *avowed* intent *controls*." We are not pre-

pared to go so far. No one denies that "residence is largely a matter of intention." In re Ozias' Estate, supra, 29 S.W.2d l. c. 243; In re Lankford's Estate, 272 Mo. 1, 197 S.W. 147, 148; 28 C.J.S. Domicile § 11a, p. 15. But (despite a loose statement to the contrary in Kokinakis v. Kokinakis, supra, 180 S.W.2d l. c. 244) it is not *entirely* a matter of intention; and intention, when considered by itself, "separate and apart from" evidence of "some act or acts in conformity with such intention," is never sufficient to establish the ultimate fact of residence, State on Inf. McKittrick v. Wiley, 349 Mo. 239, 160 S.W.2d 677, 687; Bryant v. Bryant, Mo.App., 232 S.W. 2d 199, 203; Trigg v. Trigg, 226 Mo.App. 284, 41 S.W.2d 583, 589. Then, too, a person's testimony as to his intention is simply a statement designed to create evidence of it. As it must be accepted on faith it should be received with caution, and, when in conflict with the other evidence on the subject, ought always to be subordinated to it; for it would be a curious rule that would allow a litigant by so natural and so ready an expedient to control the outcome of his case. Intent is a subjective thing. What a man says about it may as easily conceal it as reveal it. It is unrealistic to suppose that a court can penetrate into the obscurities of the human mind and there, with no surer light than that reflected by statements which it is to the litigant's manifest advantage to make, separate fact from fancy and, with any degree of certainty, lay hands on his true intent. Thus the rule has evolved that where the behavior of the householder is at odds with his professed intent, the former will control, for actions speak louder than words. Barrett v. Parks, 352 Mo. 974, 180 S.W.2d l. c. 665, 666; 28 C.J.S. Domicile § 18b(1), p. 45. In conformity with that rule we are obliged to hold that Mr. Mueller's testimonial avowals of intent, standing alone in opposition to all the other evidence, are as a matter of law too insubstantial to raise a genuine issue as to the ultimate fact of his legal residence.

It is insisted on Mr. Mueller's behalf, however, that the record contains facts which corroborate his professed intent and substantiate his claim that his apartment in the drug store building is his real home. Counsel list seven items of evidence which show, they say, that "Mr. Mueller has plenty of contact with the Twenty-First Ward." Since we are not concerned with his "contact" with that ward, but only with his claim of residence at a specific location in it, we assume that the listed items have been brought to our attention in support of that issue. Counsel say, "These are enough." We quote them below, with our comments.

(1) "He was raised there—at the corner of Prairie and Lee, first in the rooms above the drug store and then directly across the street." That is true. During that time he was a child, a member of his parents' family, and of course their domicile was his. When they moved to the house across the street and established their residence there, he, like they, lost his domicile in the drug store building. Unless he has reacquired it he cannot claim it there now. No significance is to be accorded the fact that thereafter he continued to reside in the *neighborhood* of the drug store. He has elected to stand or fall on the proposition that "my living quarters, or apartment, at 3801a Lee Avenue" constitute "my residence." He cannot establish that proposition by calling to mind his boyhood associations with other places in the general community.

(2) "He is registered to vote from there." That is true. So, for that matter, are his brothers, although admittedly "they don't use it as a place to reside." We think it too clear to admit of doubt that Mr. Mueller, like his brothers, has constituted the drug store building his place of registration "by force of imagination;" that he has "improvised" it by simply "forming an intention to claim it" there. Surely no court, upon the record made in this case, would hesitate

to rule as a matter of law that his registration from that address was improper.

(3) "He is there every day, and for a substantial time every day." That is true, on working days. He spends a far larger proportion of his time, however, leading "a normal life as husband and father" at his Veronica Avenue residence, where he abides during all "the intervals when business does not call." If time is a factor, then both quantitatively and qualitatively it leads to the conclusion that his Veronica Avenue residence is his home, and his quarters in the drug store building serve only as his business office. His normal daily routine in every respect, in fact, confirms that view.

(4) "He has living quarters there." He does have some living accommodations there; but it is "extraordinary" for him to use them for any purpose normally associated with a home. Casual quarters, indifferently furnished and infrequently occupied, which serve only the special purpose of the tenant's own convenience, which are never shared with his family, to which only business guests are invited, in which only business callers are entertained, and from which he regularly departs at end of day "for relaxation from the cares of business" in the company of his family at another address, do not comport with any recognized definition of "home."

(5) "He gets his mail there; he answers his mail there; he gets his telephone calls there." That is both irrelevant and deceptive; irrelevant, because such mail and telephone calls as he handles at that address (so far as the record discloses) relate to business matters which would normally be handled at his office rather than his home; and deceptive, because all such mail and telephone calls are attended to on the premises of the pharmacy itself, not in the apartment he claims as his home. Mr. Mueller does not contend that he resides in the pharmacy, and it is misleading to suggest that his activities there tend to establish his residence elsewhere.

(6) "He sees people there." That is true. But he sees them only for political purposes, and politics is his business. The fact that he sees them there rather than at his Veronica Avenue residence, and the purpose for which he sees them, further confirm the conclusion that his quarters there are his business office.

(7) "He finds his brothers and sister there, where they have been since childhood." Here we are surely grasping at straws. His brothers and sister do not reside there; they put in an appearance on working days for the sole purpose of operating their pharmacy. His association with them on the business premises during business hours is as devoid of significance as though it were a friendly visit with any other shopkeeper in the neighborhood.

Insinuated in the recitation of those listed facts, it will be observed, is the suggestion that the precise location of Mr. Mueller's claimed residence is unimportant if only it can be shown that *somewhere* in the Twenty-First Ward, no matter how vaguely or generally, he has conducted some activity or had some association that might be consistent with his claim. Thus it is proposed to us that his residence might be his birthplace, or perhaps the house across the street where he lived after he had abandoned his birthplace as his domicile, or perhaps the pharmacy itself. Evidence of that character may indeed show that he "has plenty of contact with the Twenty-First Ward," but it is disingenous to suggest that it contributes anything to the present inquiry, other than confusion. He cannot live all over the ward; and he cannot claim residence there at all unless at some specific place in it he maintains his settled habitation, his principal domestic establishment, his real home. That home can only be one among the many that comprise the ward. And when he identifies it with the requisite particularity as "my living quarters, or apartment" on the floor above the pharmacy in the business building at 3801a Lee Avenue, he brings the object of the inquiry into proper and precise

focus and centers it on that specific location. Activities at other places in the ward (and more especially so when they are not of a domestic character) have no relevancy.

 Mr. Mueller's final argument runs to this effect: (a) we are construing a residence requirement of a city charter; (b) we must construe it "liberally, in favor of the right of the people to select officers of their own choosing," State ex Inf. Mitchell ex rel. Goodman v. Heath, 345 Mo. 226, 132 S.W.2d 1001, 1004; and (c), "if there be any room for argument about the construction of the charter, the construction given it in practice is entitled to consideration," 2 McQuillin, Municipal Corporations, Sec. 9.22, p. 536; Van Cleve v. Wallace, 216 Minn. 500, 13 N.W.2d 467; Automobile Gasoline Co. v. City of St. Louis, 326 Mo. 435, 32 S.W.2d 281. It is argued from that premise, (a) that the voters of St. Louis have construed the residence requirement of the charter as permitting aldermen to reside outside their wards, by electing aldermen who do so, and (b), that the Board of Aldermen has adopted a similar construction by permitting non-resident aldermen to be seated. Laying aside the fact that there is no evidence in the record to support either of those conclusions, and adopting as liberal an attitude toward the question as conscience will allow, we are unable to interpret the provision in the manner desired. Its language is as clear and unambiguous as language can well be; not the faintest shadow of doubt is mirrored in its meaning. A residence requirement imposed with respect to any office is mandatory, and we are not permitted to "* * * give words an unreasonable construction in order to uphold the right of one to hold office." 67 C.J.S. Officers §§ 11 and 15, pp. 126 and 128. And we have no reason to believe that the authority which the law denies us in this particular can be supplied by the pretensions of Mr. Mueller's constituents or by the complaisance of his colleagues on the Board.

There is but one conclusion to be reached upon the record before us: Mr. Mueller is not a resident of the Twenty-First Ward. That conclusion is sustained by unassailable proof and compelled as a matter of law. The ruling of the learned trial judge was in every respect correct. We would be remiss in the exercise of one of our pleasanter prerogatives, however, were we to fail to commend counsel for both sides on their thorough research and astute presentation of this case—a little thing, perhaps, and yet a meaningful one, often overlooked in the hustle of litigation; and as often omitted in candor.

The judgment of ouster is affirmed.

WOLFE, Acting P. J., and ANDERSON, J., concur.