Candy **SIECKMANN**, Plaintiff-Appellant,

v.

C. Harry **SIECKMANN**, Defendant-Respondent.

No. 32957.

St. Louis Court of Appeals. Missouri.

June 14, 1968.

Shifrin, Treiman, Schermer & Susman, Louis Shifrin, St. Louis, for plaintiff-appellant.

Dempsey & Dempsey, David G. Dempsey, Clayton, for defendant-respondent.

DOERNER, Commissioner.

In this suit for a divorce the trial court granted plaintiff a decree dissolving the marriage relationship and awarding her

custody of Sandra, the parties' minor child, $25 per week for the child's maintenance, and $6,000 alimony in gross, payable at the rate of $30 per week. Plaintiff appeals solely from that part of the decree regarding the allowance of alimony. She asserts that the allowance of $6,000 as alimony in gross is inadequate, and that alimony from year to year should have been allowed instead of alimony in gross.

In view of the narrow issues presented it would serve no useful purpose to review the evidence regarding plaintiff's allegations of general indignities. It is sufficient to say that there was ample evidence to sustain plaintiff's charges and that we concur in the decisions made by the trial court concerning the granting of the divorce to plaintiff, the award of custody, and the allowance for maintenance of the minor child. As to the complaints made in this appeal it is, of course, our duty and responsibility " * * * to try the cause anew and enter such judgment as this court is compelled by the probative force of all the circumstances. * * * " Clemens v. Clemens, Mo., 235 S.W.2d 342; Vincent v. Vincent, Mo., 123 S.W.2d 86. While this court recognizes the rule of deference it need not concern us in this case since the only evidence introduced by defendant were copies of the parties' joint Federal income tax returns for the years 1961 to 1965, inclusive.

The uncontradicted and undisputed evidence of plaintiff, a native of Japan, is that their acquaintanceship and courtship of 2 years' duration culminated in their marriage in Tokyo on March 3, 1953, at the American Consulate. Defendant, accompanied by plaintiff and Sandra, who had been born by then, returned to this country in July, 1954, and was discharged from the Army at Los Angeles. They arrived in St. Louis the same month and at first lived with defendant's mother, who supplied them with all of their food and other necessities. In November, 1954 they moved into one of the apartments in the same building, owned by defendant's mother, who permitted them to occupy it rent free, furnished a refrigerator, and continued to provide them with money, food, and other requirements. Although he had returned to St. Louis in July, 1954, defendant did not start to work until November, 1955, well over a year after his arrival. In the interim plaintiff, receiving no money from defendant and obviously embarrassed at having to depend upon the generosity of her mother-in-law, began baby-sitting and sewing in 1954, by which means she earned $10 per week which she used to buy clothing, food and other needs of their child.

In March, 1955, long before defendant obtained gainful employment, plaintiff started to work full time at a dress shop on a piece work basis, and averaged $55 per week. She gave all of her earnings to defendant, who gave her back $20 per week, out of which she had to buy food and other necessities for the entire family. The pattern of full time employment by plaintiff, of giving all of her earnings to defendant and of receiving back $20 or $25 per week for food, clothing and other needs of the entire family continued until the summer of 1957 when plaintiff, then employed at Stix, Baer and Fuller, cashed one of her pay checks in order to buy clothing and toys for their child. For doing so defendant upbraided her, told her she was to bring home her check, and during the argument which followed told her to get out of the house that night. She did, in the rain, and with their child sought refuge with her mother-in-law. The next night defendant appeared, a reconciliation was effected, and plaintiff returned home.

From that time in 1957 until 1963 plaintiff did not give her earnings to defendant but used them to buy drapes, a lawnmower, a fan, a vacuum cleaner, and other items for their home, and spent $2,000 or more to fix up a rathskeller in their house. Out of her earnings she also purchased the food and clothing for the entire family, even to the beer which defendant consumed, and bought herself a car. Part of

the time she held two jobs, one during the day and another at night, and bore the expense of a baby-sitter. During this period, according to plaintiff's uncontradicted and undisputed testimony, defendant took expensive lessons to learn to fly an airplane, joined a country club and played golf, bowled, and engaged in archery, and although he earned a substantial salary (according to the income tax returns, $7624 in 1961, $8638 in 1962, and $10,574 in 1963) he gave no money at all to plaintiff.

In May, 1963, with $400 she had saved and $970 contributed by defendant, plaintiff and their child made a trip to Japan. Upon her return in August of that year, she informed defendant that she did not want to work and desired to stay at home, and he gave her between $25 and $35 a week for their food and other expenses, including his beer. Plaintiff found this insufficient for their needs, repeatedly asked defendant for more money, and received the answer that he didn't have any money —although he earned $10,574 that year. Becoming tired of asking for funds and being refused, plaintiff again went back to work, in November 1963, on a part time basis, because of her health. At the time the case was tried, in March 1967, she was still limited to working 20 hours a week, for which she received take-home pay of $59.00.

A summary of plaintiff's wages from 1954 until the separation occurred in 1966 revealed that she earned a gross amount of over $45,000, which was subject to withholding taxes of about $11,000, leaving a net of approximately $34,000. The amount earned by defendant in 1961, 1962 and 1963, as revealed by the joint income tax returns, has been stated. The returns for 1964 and 1965, introduced by defendant, showed that he earned $11,010 and $11,495 in those years, respectively. Plaintiff was permitted to introduce a photostatic copy of a W-2 Form from defendant's employer, McDonnell Aircraft Corporation, in which it reported it had paid defendant wages of $14,631 in 1966. This exhibit was introduced under a stipulation by defendant's counsel, conditioned that defendant's base pay for that year was $11,500 and the remainder was for overtime.

Unfortunately, other than the evidence regarding the earnings of the parties, there is little in the record regarding their financial resources. Plaintiff testified that from the money she earned after defendant left she had saved $400, but she was not asked whether this was the total extent of her assets. No evidence regarding defendant's assets was introduced. The income tax return for 1965 showed the receipt of interest of $12 on bonds and $12.39 from "Prudential" but since it was a joint return it does not appear therein which of the parties received said sums. Defendant's mother, Mrs. Florence Sieckmann, who appeared as a witness in behalf of plaintiff, testified that she gave $2300 to both of the parties to be used as a down-payment when they purchased their first home, on Belleclaire, and plaintiff stated that they had traded that house in on the purchase of their home on Hudson in 1960. Plaintiff indicated that she was occupying it at the time of trial, but how the title was held, or the value of the equity therein, was not definitely shown. If the title is held by the entirety, as was indicated, then when the parties became tenants in common upon the granting of the divorce defendant received the benefit of one-half of the $2,000 of plaintiff's funds which she expended on the rathskeller.

There is a corresponding dearth of evidence regarding the state of plaintiff's health. Plaintiff testified that she had had a miscarriage in August or September, 1954; that while working at Chromcraft, about 1960, she passed out, had "woman trouble," and was off from work for an unstated period, sufficiently long that she drew $700 in unemployment compensation insurance (much of which was used to defray their moving expenses from Belleclaire to Hudson); and that in November, 1965 she became ill (what her doctor told her of his diagnosis was stricken) and was hospi-

talized in Mount St. Rose Hospital for two months. Since then, she testified, she has not been able to work more than 20 hours a week because of "my pains," and at the time of trial was taking medication for "my nervous and pain." Thus the record leaves much to be desired as to why plaintiff was in the hospital and the nature and extent of her present disability.

Section 452.070, RSMo 1959, V. A.M.S., provides that when a divorce is adjudged the court shall make such order touching the alimony of the wife as, from the circumstances of the parties and the nature of the case, shall be reasonable. Under our modern concept of marriage as a contract rather than a sacrament, Nelson v. Nelson, 282 Mo. 412, 221 S.W. 1066, our courts have repeatedly said that when a decree of divorce is granted to the wife, "* * * an allowance of alimony is in the nature of an award for damages because of the husband's breach of the marriage contract * * *." Smith v. Smith, 350 Mo. 104, 164 S.W.2d 921; Nelson v. Nelson, supra; Knebel v. Knebel, Mo. App., 189 S.W.2d 464. The amount of alimony to be allowed, if any, and whether in gross or from year to year, as Section 452.080 describes it, must necessarily be governed by the facts and circumstances in each particular case, and those which invariably enter into any such determination are: the length of the marriage, the respective financial conditions of the parties, their ages, health, training and education, their respective contributions to any accumulations and whether there are minor children and their ages. Simon v. Simon, Mo., 248 S.W.2d 560; Carr v. Carr, Mo., 232 S.W.2d 488; Knebel v. Knebel, supra.

As we have indicated, the record is incomplete as to a number of such factors, but it is sufficient to convince us that the award made of $6,000 as alimony in gross

payable at the rate of $30 per week, is entirely inadequate. The effect of such an allowance, if permitted to stand, is that plaintiff would receive nothing after about 4 years, certainly an insufficient provision for her future support. Under the circumstances existing in the instant case it would be more beneficial, just and reasonable, in our opinion, to award alimony on the basis of "from year to year," payable in monthly amounts. In reaching that conclusion and the amount which we deem reasonable we have taken into account the large amount of earnings contributed by plaintiff towards the support and maintenance of the family prior to the separation of the parties, the substantial income which the defendant enjoys, the ill health of plaintiff and her consequent inability to work full time, her financial needs, her foreign training and education, and her lack of any substantial financial resources.

That part of the judgment granting plaintiff alimony in gross is reversed and the cause remanded with directions to amend the judgment so as to award plaintiff alimony payable from year to year of $2400 per year payable $200 per month on the first day of each month, until her remarriage or death, effective as of the date of the original judgment, and to give defendant credit for any payments made by him.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court.

Accordingly, judgment granting plaintiff alimony in gross is reversed and cause remanded with directions.

ANDERSON, P. J., RUDDY, J., and JAMES H. KEET, Jr., Special Judge, concur.